# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ALBERT SIDNEY JOHNSTON Chapter No. 2060, United Daughters of the Confederacy, ROBIN TERRAZAS, President, JEAN CAROL LANE, First Vice-President | § § § § | |
| v. | § § | CIVIL ACTION NO. SA-17-CV-1072-DAE |
| RON NIRENBERG, in his Official Capacity as Mayor of the City of San Antonio, and ROBERT TREVINO, WILLIAM SHAW, REBECCA VIAGRAN, REY SALDANA, SHIRLEY GONZALES, GREG BROCKHOUSE, ANA SANDOVAL, MANNY PALAEZ, and JOHN COURAGE, in their Official Capacities as members of the San Antonio City Council, and the CITY OF SAN ANTONIO | § § § § § § § § | |

## PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE REGARDING MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs, the Albert Sidney Johnston Chapter, Robin Terrazas, and Jean Carol Lane, submit this their Reply to Defendants' Response Regarding Plaintiffs' Motion For Preliminary Injunction, and show as follows:

1. Concerned about the state of the items in the time capsule, Plaintiffs filed their Motion for Preliminary Injunction on Dec. 22, 2017. That was the last work day before Christmas Day. The Defendants also filed their second Motion to Dismiss on Dec. 22, 2017. Defendants' first Motion to Dismiss is still pending. Defendants submitted their Response to Plaintiffs' Motion for Preliminary Injunction on Dec. 29, 2017.

2. In their Response, the Defendants argue that the ordinance authorizing the removal of the statue also included the contents of the statue. Def's Response, p. 6. The Defendants did not dispute that the Plaintiffs attached an accurate copy of Ordinance 17-4900. That ordinance never mentions the time capsule or contents of the statue. See Ex.

A, Ord. 17-4900, attached to Pl's Mtn Preliminary Injunction. The members of the City Council did not discuss the time capsule during their deliberations on Ag. 31, 2017. The Defendants claim the Plaintiffs have not offered one "scintilla" of evidence that the contents of the time capsule will suffer further deterioration. Def's Res., p. 9. But, the Defendants do not deny that they have prohibited the members of the ASJ chapter from viewing the statue or the foundation themselves. They do not deny they have prevented the members from even viewing the time capsule and its contents. The Defendants have merely mentioned to Plaintiffs' counsel that "not much" remains of the time capsule. This situation is similar to the car thief who takes the car, hides it and then complains the owner cannot prove the car was damaged. The Defendants want to have their cake and eat it too.

<u>1. The contents of the time capsule will likely suffer some damage from the oxidation process.</u>

A quick search on Google revealed the attached information from the Library of Congress. The Library of Congress states on page one that "Besides acid hydrolysis, paper is susceptible to photolytic (damage by light) and oxidative degradation." See Ex. A, The Deterioration and Preservation of Paper: Some Essential Facts, (accessed Jan. 2, 2018), p. 1. The term "oxidative" refers to exposure to oxygen. When the time capsule was removed from the foundation of the monument, it was exposed to air and light in ways it had not been so exposed in over 100 years. The Plaintiffs are concerned. The Defendants do not dispute Plaintiffs' concern. Instead, they assert that the Plaintiffs lack proof that exposure to air will cause further deterioration. Def's Resp. p. 9. But, Plaintiffs are not claiming affirmatively the papers will deteriorate further. They are expressing concern that the papers will *likely* suffer degradation. Without examining the "not much" remains of the time capsule, the Plaintiffs cannot be certain.

As the Library of Congress paper mentions, different kinds of paper deteriorate at different rates. Newspaper paper was made from mechanically pulped paper. That sort of paper was not as strong as rag based paper. Books that are exposed to air will absorb air borne pollutants. Ex. A, Deterioration of Paper, p. 1. The time capsule described in the 1899 San Antonio *Daily Express* mentioned that newspapers, rosters of the Barnard E.

2

Bee chapter, a prayer book, a Bible, etc. were inserted into the metal box. See Ex. D, R. Schimpff Affid., attached to Pl's Mtn Preliminary Injunction. The time capsule contained various types of paper, including newspaper and books. If the City of San Antonio would allow the ASJ chapter to view the contents, the Plaintiffs could make their own determination. Without access to the time capsule, the chapter can only indeed "speculate," as the City asserts. But, that speculation is forced by the City. This would be an appropriate moment for the City to mention publicly what it found when it opened the time capsule.

The City likely did not expect a time capsule when it removed the monument. It removed the monument the same day as the final vote to remove it. The City rushed the project. In her columns about the monument in August, Paula Allen did not mention the time capsule. See San Antonio *Express-News*, Aug. 14, 19, 2017. Ms. Allen reportedly omitted mention of the time capsule to avoid encouraging theft. The City was concerned about safety. But, in its rushed concern, it refused to discuss the monument with members of the ASJ chapter, who have a deep knowledge of the history of the monument.

2. There is more to the time capsule than hearsay.

The City does not deny the substance of the two San Antonio 1899 newspapers. Both newspapers describe in detail what was included in the time capsule. Yet, the City apparently refers to those newspaper reports as "folklore, inference, and hearsay." Def's Resp, p. 8. Yet, at trial those newspapers would be admissible as "ancient documents." Fed.R.Ev. Rule 803(16). *See Dallas County v. Commercial Assurance Co.*, 286 F.2d 388, 396-397 (5th Cir. 1961) (Contemporary newspapers from 1901, while not categorized as an ancient document, may be more trustworthy than eye witness accounts); *Hicks v. Charles Pfizer & Co., Inc.*, 466 F.Supp.2d 799, 805 (E.D.Tex. 1995) (30 year old newspaper accounts may be admissible as an ancient document). That the City does not deny the substance of the two newspaper accounts is telling. One of the accounts clearly describes a metal box which contained the historical items. See Ex. D, R. Schimpff Affid., attached to Mtn Preliminary Injunction, p. 1. The time capsule included several coins. It does seem likely that metal would resist water intrusion. The City points to water infiltration in its Response as causing the loss of papers. Def's Resp. at p. 10 n.4. But,

3

water infiltration does not explain the metal coins or the metal box.

3. Refusing to return the time capsule constitutes another violation of Sec. 1983.

The Defendants cannot claim the refusal to return the time capsule is a random or unauthorized act. Since, the failure to return the property to the ASJ chapter violates Sec. 1983. Even now in litigation, the Defendants claim ownership of the time capsule because allegedly, the time capsule was included within Ordinance 17-4900. Yet, the ordinance never mentions the time capsule. Defendants point to no authority for its position. It states flatly that the ordinance applied to the monument and its "components and contents." Def's Resp. at p. 8. Again without authority, the Defendants claim Ord. 17-4900 did not provide for the removal of the monument with the "intent to exclude some items that were part – or located inside – of the same monument." Def's Resp, at p. 6.

In *Lathon v. City of St. Louis*, 242 F.3d 841 (8th Cir. 2001), the city seized $33,000 in cash, 18 firearms and 21 boxes of ammunition from the home of the plaintiff. The seizure was made as part of the execution of a search warrant pursuant to a narcotics investigation. No charges were ever filed against Mr. Lathon. Yet, the city refused to return any of the property, simply saying some of the firearms were assault weapons. The Eighth Circuit held that post-deprivation process does not matter when the governmental entity refuses to return property. There was no question the property was not needed for a prosecution or that any of the property constituted contraband. The violation of Sec. 1983 occurred when the city refused to return the seized property. *Lathon*, at 843-844. Like the plaintiff in *Lathon*, the ASJ chapter would have to file a separate lawsuit to recover its time capsule. *Lathon*, at 844 (Finding it not an adequate remedy that the plaintiff would have to file four separate lawsuit to recover his property). The City argues the proper remedy for the ASJ chapter is to file a second lawsuit. Def's Resp at p. 7 n.2. Indeed, the Defendants essentially argue the Plaintiffs should be required to file a second lawsuit because the City of San Antonio refuses to return the Plaintiffs' property. The violation of Sec. 1983 does not necessarily occur when the time capsule was seized. The violation occurs when the City refuses to return property to its rightful owner. The statue had the words "United Daughters of the Confederacy" and "Barnard E. Bee chapter" engraved on

4

the foundation. The city cannot be in any doubt as to the likely owner of any property found during the removal process.

Remarkably, the City seems to argue that it has acquired ownership of the monument and of its contents because the Barnard E. Bee chapter and the ASJ chapter did not provide funds with which to maintain the statue in the past 118 years. The City asserts it has maintained the statue for over a century. Def's Resp, at p. 7. The Defendants cite no authority for this assertion. It does not explain what sort of maintenance a granite statue would require for over 100 years. It also argues that the ASJ chapter did not "assert" any ownership interest in the monument for 44 years. Def's Resp. at p. 7.

The City's argument suggests the BEB and the ASJ chapter may have abandoned the statue in some way. "Abandonment" is the relinquishment of a right by the owner with the intention to forsake or desert it. *Texas Water Rights Commission v. Wright*, 464 S.W.2d 642, 646 (Tex. 1971). Non-use of a right is not enough to show abandonment unless the failure to use the property is long and unexplained. *Dominey v. Unkown Heirs and Legal Representatives of Lokomski*, 172 S.W.3d 67, 73 (Tex.App. Ft. Worth 2005); *Strauch v. Coastal States Crude Gathering Co.*, 424 S.W.2d 677, 683 (Tex.App. Corpus Christi 1968, writ dismissed) (The passage of time alone does not constitute an abandonment of vested rights). An essential element of abandonment is an intention to abandon, which must be established affirmatively by facts showing intent to abandon. *Strauch, id*, at 683. The plaintiffs have not abandoned their statue. They conducted ceremonies at it over the years. They re-dedicated the monument in 1999. See Pl's First Am. Compl., at p. 6, para. 16. Indeed, when it became apparent that the new Mayor would consider removing the statue, the ASJ chapter started communicating with the City in June, 2017, trying to discuss alternatives. See Ex. B, R. Terrazas Affid., p. 1-2, attached to Pl's Mtn Preliminary Injunction. The City rebuffed Ms. Terrazas' efforts. The chapter was not required to "assert" its ownership interest. There is no legal avenue to acquire ownership of personal property over time. There is no adverse possession for personal property.

The City suggests it needed more time in which to prepare its response to Plaintiffs' Motion for Preliminary Injunction. See Def's Resp. p. 7 n.3. The Plaintiffs

5

would have readily agreed to extend the deadline if they had been asked. The Plaintiffs did file its motion just before Christmas. The City also filed its second dispositive motion just before the Christmas holiday. No, the Plaintiffs have no knowledge regarding when or for how long the City takes its holidays. But, in the interests of judicial efficiency, the Plaintiffs would consider any reasonable request to extend a deadline. The Plaintiffs were and still are motivated by their concern for the historical artifacts contained in the time capsule.

When Plaintiffs' counsel spoke with Defendants' counsel on Dec. 11, he did indeed inform the Defendants that if the Defendants could not return the contents of the time capsule, or allow the ASJ chapter to view the "not much" remains, then the Plaintiffs would have to seek a preliminary injunction. It appears the City engaged in no discussions about the contents of the time capsule, despite that Dec. 11 phone call. See Def's Resp. at p. 10 n.4.

WHEREFORE, Plaintiffs pray that a preliminary injunction be issued restraining and enjoining Defendants and their employees and agents from retaining any remaining contents of the time capsule within the foundation of the Travis Park monument in violation of the plaintiffs First, Fifth, and Fourteenth Amendment rights under the U.S. Constitution; that Plaintiffs be awarded damages for lost or damaged items contained within the time capsule; and for all relief, at law and in equity, to which they may be entitled.

Respectfully submitted,

_Thomas J. Crane_
Thomas J. Crane
T.S.B. No. 05007320

LAW OFFICE OF THOMAS J. CRANE
110 Broadway, Suite 420
San Antonio, Texas 78205
(210) 736-1110
(210) 745-4258 Fax
tom@cranelawyer.net

Attorney for Plaintiffs

## Certificate of Service

I certify that a true copy of the foregoing instrument was electronically filed on the 4th day of January, 2018 with the Clerk of Court using the CM/ECF system which will send notice of such filing to the following counsel:

Shawn Fitzpatrick
Fitzpatrick & Kosanovich
P.O. Box 831121
San Antonio, Texas 78283-1121

_Thomas J. Crane_
Thomas J. Crane

# EXHIBIT A
# THE DETERIORATION AND PRESEVATION OF PAPER: SOME ESSENTIAL FACTS

# The Deterioration and Preservation of Paper: Some Essential Facts

🖨 Print   📡 Subscribe   @ Share/Save   💬 Give Feedback

« Back to Collections Care

## The Deterioration and Preservation of Paper: Some Essential Facts

Paper deterioration is still a problem, but thanks to years of scientific research by the library community and beyond, it is no longer a mystery. The preservation strategy for paper materials at the Library of Congress continues to evolve as our scientific understanding of deterioration mechanisms has progressed.

### Factors that Promote Paper Deterioration

Why is 500-year old paper often in better condition than paper from 50 years ago? In other words, what makes some papers deteriorate rapidly and other papers deteriorate slowly?

> The rate and severity of deterioration result from internal and external factors: most importantly, the composition of the paper and the conditions under which the paper is stored.
>
> Paper is made of cellulose -- a repeating chain of glucose molecules -- derived from plant cell walls. One measure of paper quality is how long the cellulose chains, and subsequently the paper fibers, are: long-fibered paper is stronger and more flexible and durable than short-fibered paper.
>
> In the presence of moisture, acids from the environment (e.g., air pollution, poor-quality enclosures), or from within the paper (e.g., from the raw materials, manufacturing process, deterioration products), repeatedly cut the glucose chains into shorter lengths. This acid hydrolysis reaction produces more acids, feeding further, continued degradation.
>
> Before the mid-19th century, western paper was made from cotton and linen clothing rags and by a process that largely preserved the long fibers of the raw material. While fibers may shorten with age, rag papers tend to remain strong and durable, especially if they have been stored properly in conditions not overly warm or humid.
>
> Starting in the mid-19th century, wood replaced rags as the raw material for paper manufacture. Wood is processed into paper by mechanical or chemical pulping, which produces paper with shorter (compared with rag paper) fibers.
>
> Mechanical pulping produces paper with the shortest fiber length and does not remove lignin from the wood, which promotes acid hydrolysis. Newspapers are printed on mechnically pulped paper. Chemical pulping removes lignin and does not cut up the cellulose chains as thoroughly as mechanical pulping, yielding a comparatively stronger paper, but which is still not as durable as rag paper.
>
> Wood pulp paper from before the 1980s also tends to be acidic from alum-rosin sizing (added to the paper to reduce absorbency and minimize bleeding of inks), which, in the presence of moisture, generates sulfuric acid.
>
> Acids also form in paper by the absorption of pollutants -- mainly sulfur and nitrogen oxides. Book leaves that are more brown and brittle along the edges than in the center clearly illustrate this absorption of pollutants from the air.
>
> Research by the Library of Congress has demonstrated that cellulose itself generates acids as it ages, including formic, acetic, lactic, and oxalic acids. Measurable quantities of these acids were observed to form under ambient conditions within weeks of the paper's manufacture. Moreover, paper does not readily release these acids due to strong intermolecular bonding. This explains why pH neutral papers become increasingly acidic as they age.
>
> Acids form in alkaline paper as well, but can be neutralized by the alkaline reserve.
>
> Besides acid hydrolysis, paper is susceptible to photolytic (damage by light) and oxidative degradation. Photodegradation appears to progress more severely and rapidly in poorer quality papers.
>
> The role of oxidative degradation appears limited compared with acid hydrolysis, except in the presence of

Generally speaking, good quality paper stored in good conditions (cooler temperatures; 30-40% relative humidity) are able to last a long time -- even hundreds of years.

### Accelerated or Artificial Aging Tests

One can readily observe that papers from hundreds of years ago are often still in good condition and that papers from not even 30 years ago are often brittle or perhaps even unusable. So as not to rely on anecdotal observation, scientists have developed experimental methods known as *accelerated* or *artificial aging* to collect data over weeks or months on how materials may age over years or decades.

> Artificial or accelerated aging tests for paper is continually evolving and is viewed as more or less meaningful, depending on the test parameters and what information is sought from the data.
>
> The U.S. National Bureau of Standards, now the National Institute of Science and Technology, carried out early accelerated aging tests on paper in the 1920s-1930s, which involved inducing aging with elevated temperatures. In the 1940s, William Barrow used elevated temperature aging methods to project lifetimes of paper samples. Barrow's predictions have since been proven to be erroneous and illustrate the importance of the test parameters and of framing questions appropriate to the test design.
>
> Today, artificial aging tests combine elevated temperatures and elevated humidity, recognizing the essential role that moisture plays in the acid hydrolysis of paper.
>
> A five-year research effort completed in 2000 at the Library of Congress showed similar chemical products formed during natural and accelerated aging of paper. Moreover, when naturally-aged papers were subsequently subjected to accelerated aging in the laboratory, the degradation products from natural aging simply increased in concentration by predictable proportions; no new degradation products were identified. These results suggest that well designed artificial aging tests can provide a good approximation of natural aging and is a valid and reliable test for predicting paper longevity.
>
> Artificial aging tests show that the rate at which paper degrades increases with time as acidic degradation products accumulate in the paper.

### Other Experiments and Findings

> Experiments with cotton rag papers (see Henk Porck, "Rate of Paper Degradation") have found that the center of the leaf in a book tends to be weaker than the edges and that paper bound in books ages faster than loose single sheets of paper. (Not to be confused with the observation of brittle edges that result when the paper absorbs, starting at the edges, industrial pollutants from the air, which catalyze acid hydrolysis.)
>
> In other words, the moisture contained within the paper contributes to acid hydrolysis and paper deterioration. In an closed airtight environment, the paper retains the acidic degradation products, which accelerate aging.

### Applying the Scientific Findings to Library Practice

> In the 1980s, paper manufacturers began adding alkaline buffers to wood pulp papers intended for lasting use and today this is common practice. Alkaline buffers retard or prevent acid hydrolysis by neutralizing acids that attack the cellulose chains. Alkaline wood pulp papers stored under good conditions are long lasting. Since the 1990s, books published in the U.S. that conform to ANSI/NISO paper permanence standards (e.g., ANSI/NISO Z39.48 - 1992) are likely to be printed on chemically purified wood pulp alkaline paper.
>
> Alkaline papers made of chemically purified wood pulp (high alpha cellulose) mixed with cotton are also available and are recommended for permanent documents.
>
> The useful life of retrospective collections on acidic paper, but which are still serviceable (i.e., not yet brittle), can be extended many times by neutralizing or removing the acids in the paper.
>
> Neutralizing the acids with an alkalizing agent is an approach that can be scaled to address millions of items (mass deacidification) and is an option for loose sheets as well as for bound items.
>
> If mass deacidification treatment is carried out while the paper still has significant measurable strength, *and* the treated items are then stored under proper conditions, these once-acidic items are projected to remain in usable condition for several centuries, rather than becoming brittle and unusable in only fifty to a hundred years.
>
> Improving environmental storage conditions, regardless of whether the item can be deacidified, will also significantly slow the rate of degradation and extend the useful life of paper items.

## References

Shahani, C. J., S. B. Lee, F. H. Hengemihle, G. Harrison, P. Song, M. L. Sierra, C. C. Ryan, and N. Weberg. "Accelerated Aging of Paper." In ASTM Paper Aging Research Program, *ASTM Research Report* (RR:D06-1004), available as *Adjunct to D6789 Standard Test Method for Accelerated Light Aging of Printing and Writing Paper by Xenon-Arc Exposure Apparatus*. West Conshohocken, PA: ASTM International, 2002.

Shahani, C.J., and G. Harrison. "Spontaneous Formation of Acids in the Natural Aging of Paper." In *Works of Art on Paper: Books, Documents and Photographs*. Edited by V. Daniels, A. Donnithorne, and P. Smith, 189-192. London: International Institute for Conservation of Historic and Artistic Works, 2002.

⊕ Back to Top