# EXHIBIT E
# ROBIN TERRAZAS DEPOSITION

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

ALBERT SIDNEY JOHNSTON           )
CHAPTER NO. 2060, UNITED         )
DAUGHTERS OF THE                 )
CONFEDERACY, ROBIN TERRAZAS,     )
PRESIDENT, JEAN CAROL LANE,      )   5:17-CV-1072-DAE
FIRST VICE-PRESIDENT,            )
                                 )
        Plaintiffs,              )
                                 )
vs.                              )
                                 )
THE CITY OF SAN ANTONIO,         )
                                 )
        Defendant.               )
_____)

*****************************************

ORAL DEPOSITION OF

ROBIN TERRAZAS

AUGUST 29, 2018

*****************************************

THE ORAL DEPOSITION of ROBIN TERRAZAS, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above styled and numbered cause on Wednesday the 29th day of August, 2018 from 1:23 p.m. to 4:03 p.m., before PAMELA SUE PETERSON, Certified Shorthand Reporter in and for the State of Texas, reported by stenographic and computer-aided transcription, at the Law Office of Thomas J. Crane, 110 Broadway, Suite 420, San Antonio, Texas 78205, pursuant to the Federal

Robin Torresao                                              Albert Sidney Johnston v. City of San Antonio

Page 18

1   have to ask you not to answer.
2          I mean, now you're getting into
3   attorney-client privilege. You're asking her why her
4   attorney advised her to become a party to the
5   lawsuit.
6       Q.  BY MR. FITZPATRICK: Let me just ask this.
7   Are you making any separate claims on your
8   individual -- in your individual capacity in this
9   lawsuit?
10      A.  I guess not, no. I mean, I'm here as a
11  representative of the chapter. I'm not trying to
12  separate myself.
13      Q.  Okay. Well, actually, that saves a lot of
14  time here.
15         So, then, let me ask you some questions
16  about your -- your allegations here.
17         (Defendant's Exhibit T-1 was marked.)
18         MR. FITZPATRICK: I have marked as
19  deposition Exhibit No. T-1, the copy of your third
20  amended complaint.
21      Q.  BY MR. FITZPATRICK: On Page 3, it's your
22  allegation here that in March -- on March 27, 1899,
23  the City Council granted to the Bernard (sic) Bee
24  chapter the right to use the land in the center of
25  Travis Park; correct?

Page 19

1       A.  Uh-huh.
2       Q.  And I'm reading from Paragraph 5.
3          And would that be an interest that was --
4   that is reflected in what I'm marking as deposition
5   Exhibit No. 2?
6          (Defendant's Exhibit T-2 was marked.)
7          MR. FITZPATRICK: I really screwed up.
8          Here you go, Tom.
9          THE WITNESS: Okay. So the handwritten
10  part you can't see at all, but -- so your question,
11  again, was does this document reflect the claim that
12  Barnard Bee chapter had the right to use the land?
13      Q.  BY MR. FITZPATRICK: No, let me ask the
14  question again.
15         Is this the -- is Exhibit T-2 a
16  representation of what you have alleged to be an
17  ordinance dated March 27, 1899, whereby the City of
18  San Antonio granted to the Bernard Bee chapter the
19  right to use the land in the center of Travis Park?
20      A.  Yes.
21      Q.  Okay. Is there any other document on which
22  that claim is based?
23      A.  No.
24      Q.  Okay. So you also allege that the City
25  gave in the same -- I'm sorry -- I'm in the same

Page 20

1   paragraph here -- that the City gave use of the land
2   underneath the monument to the Bernard E. Bee chapter
3   in perpetuity. Are you making that allegation?
4       A.  Yes.
5       Q.  And by "in perpetuity," what do you mean by
6   that?
7       A.  That it was a permanent -- it was given use
8   permanently.
9       Q.  Okay. And what is your understanding of
10  whether or not the monument was intended to remain
11  there permanently?
12      A.  I know it was -- it was stated in 1999 when
13  they rededicated the monument -- the Albert Sidney
14  Johnson (sic) chapter rededicated the monument in
15  1999. And the president at that time was Theresa
16  Gold, and she -- she reported it having been in
17  perpetu- -- whatever -- she used that word, too; that
18  it had been granted to -- the chapter had been
19  granted use of that land.
20      Q.  Okay. I mean, is it your understanding
21  that the chapter intended the monument to remain
22  there forever?
23      A.  Yes. Yes.
24      Q.  Okay. So if you look at Exhibit T-2, is
25  there -- can you find me any indication in there of

Page 21

1   the type of permanence that you've just testified to?
2       A.  I don't see anything that says until any
3   certain condition exists that it would be removed.
4   It's a large statue. I can't imagine that the City
5   would have said, "Okay, here, you can put this statue
6   here and we expect it to be removed at some point,"
7   considering the size of it.
8       Q.  Okay. The language in Exhibit T-2 does not
9   use the term "perpetual," does it?
10      A.  No, it does not.
11      Q.  Okay. It doesn't say "forever"?
12      A.  It doesn't say any limitations.
13      Q.  Okay. Well, and what exactly were the
14  Daughters of the Confederacy asking for, according to
15  Exhibit T-2?
16      A.  Permission to erect a monument in Travis
17  Park.
18      Q.  Anything else?
19      A.  I don't see anything else, no.
20      Q.  Okay. Where is Bernard E. Bee mentioned
21  here?
22      A.  It is not mentioned here, but the petition
23  was written by Barnard E. Bee.
24      Q.  Do you have a copy of the petition?
25      A.  I don't remember.

6 (Pages 18 to 21)

Hoffman Reporting _ Video Service                                    210) 736-3555
Electronically signed by Pamela Peterson (201-396-129-9161)          619a3864-618d-4c8c-b156-f71c0e39310f

## Page 22

1   Q. Have you ever seen --
2       THE WITNESS: Can I ask you that question.
3       MR. CRANE: Well, no, you -- I'm afraid you
4   have to answer the question.
5       THE WITNESS: I -- I don't remember.
6   Q. BY MR. FITZPATRICK: Okay.
7   A. It -- it --
8       MR. CRANE: I can stipulate --
9       THE WITNESS: It seems that we've seen it,
10  but I don't remember.
11  Q. BY MR. FITZPATRICK: You know, when "I
12  don't remember" is the truthful answer, it's the
13  right answer.
14      MR. CRANE: But I'm happy to stipulate if
15  there is such a kind of petition, it has not revealed
16  itself.
17      MR. FITZPATRICK: Okay.
18  Q. BY MR. FITZPATRICK: Is there any other
19  document that you're aware of that reflects that
20  Bernard E. Bee rather than the United Daughters of
21  the Confederacy were granted permission by the City
22  Council back in 1899?
23  A. Well, it was the UDC that was granted
24  permission, but it was through the Barnard Bee
25  chapter.

## Page 23

1   Q. Okay. And I'm -- do you have any document
2   that reflects that relationship that you just
3   described?
4   A. What relationship?
5   Q. That this permission was granted to the
6   UDC, but through the Bernard E. Bee chapter?
7   A. Well, it -- you see that the petition was
8   written by Barnard E. Bee. And then the ordinance
9   states "UDC."
10  Q. Okay. Have you looked through the Bernard
11  E. Bee meeting minutes to determine whether there's
12  any document or other indication that would suggest
13  that Bernard E. Bee was the petitioner here?
14  A. We have not been able to locate the
15  Barnard E. Bee minutes from --
16  Q. Those weren't turned over to you -- I'm
17  sorry, I didn't mean to talk over you.
18  A. We've not been able to locate those minutes
19  from that time period.
20  Q. Okay. So those weren't turned over to your
21  chapter when Bernard E. Bee disbanded?
22  A. Barnard Bee did not disband until in the
23  1970s. And I don't know what happened to the minutes
24  at the time. We've been able to find some of their
25  minutes from different time periods --

## Page 24

1   Q. Uh-huh.
2   A. -- but not from when this occurred.
3   Q. Okay. You would agree with -- well, would
4   you agree with me that the Daughters of the
5   Confederacy is a distinct organization than a chapter
6   of the Daughters of the Confederacy?
7   A. I'm sorry? Could you repeat that.
8   Q. Okay. So there's something called "The
9   United Daughters of the Confederacy"?
10  A. Yes.
11  Q. And there's something called "The Albert
12  Sidney Johnson (sic), Chapter 2060" --
13  A. Uh-huh.
14  Q. -- "of the United Daughters of the
15  Confederacy"?
16  A. Uh-huh.
17  Q. Would you agree with me that they are
18  separate organizations?
19  A. It is the same organization, separate
20  chapters.
21  Q. Okay. Well, would you agree with me that
22  when a chapter disbands, the UDC rules require the
23  chapter's property to be surrendered to the UDC --
24  well, I'm sorry, the State division of the UDC?
25  A. That's dependent on the chapter. It's left

## Page 25

1   up to the chapter to decide what they do with those
2   items.
3       When Barnard Bee disbanded, the president
4   of the chapter came to visit the Albert Sidney
5   Johnson chapter, and she specifically handed the copy
6   of the ordinance to the president and said that "We
7   want you to have this in event that there's ever any
8   need for it."
9   Q. Okay.
10  A. So at that time we take it that we were
11  given the responsibility of protecting the monument
12  in Travis Park.
13      MR. CRANE: But let the record show that
14  the witness is pointing to the 1899 ordinance.
15  Q. BY MR. FITZPATRICK: Okay. So what you --
16  what you've said is that it's your testimony that
17  when the Bernard E. Bee chapter disbanded, it gave to
18  Albert Sidney Johnston --
19  A. Yes.
20  Q. -- its property -- well, specifically the
21  monument?
22  A. Responsibility for the monument, yes.
23  Q. Okay. So -- well, responsibility for the
24  monument or ownership of the monument?
25  A. There was no ownership papers, so I don't

7 (Pages 22 to 25)

Hoffman Reporting _ Video Service                                           210) 736-3555
Electronically signed by Pamela Peterson (201-396-129-9161)    619a3864-618d-4c8c-b156-f71c0e39310f

Page 26

1  see how that would have transferred.
2      Q.  Are you claiming that the monument is the
3  property of the Albert Sidney Johnston chapter?
4      A.  Yes.
5      Q.  Okay.  So who owned it before the Albert
6  Sidney Johnston chapter did?
7      A.  Barnard Bee or you could say UDC.
8      Q.  Well, which would you say?
9      A.  Barnard Bee is the one that raised the
10 funds.  They spent three years on the project for
11 development, for placing it, raising the money not
12 just for the development of this statue, but also to
13 have it placed; so I would say Barnard Bee.
14     Q.  Well, the UDC didn't give you the statue;
15 true?
16     A.  They did not; but, again, the UDC is an
17 organization with chapters within.
18     Q.  Uh-huh.
19     A.  So this was an effort of the Barnard Bee
20 chapter, so ...
21     Q.  And what I'm getting at is each chapter has
22 its own charter; correct?
23     A.  Yes.
24     Q.  Has its own membership; correct?
25     A.  Yes.

Page 27

1      Q.  Pays its own dues?
2      A.  It does; but some of those dues go to the
3  national --
4      Q.  That's --
5      A.  -- so it's all one organization still.
6      Q.  And that's because the chapter pays the
7  dues to the State division; correct?
8      A.  Well, the individuals are paying; but it
9  goes through the chapter and then to division and
10 general.
11     Q.  Okay.  And each chapter has separate
12 property ownership rights; correct?
13     A.  Yes.
14     Q.  Okay.  And the UDC itself has ownership
15 rights of its own property; true?
16     A.  Yes.
17     Q.  And among the UDC rules are that if a
18 chapter disbands --
19     A.  Uh-huh.
20     Q.  -- that it surrenders its minutes and it
21 surrenders its property to the State division; true?
22     A.  Unless otherwise decided on, on the
23 chapter.
24     Q.  Okay.  But --
25     A.  There is that.

Page 28

1      Q.  -- unless there's an exception, what I just
2  said was true?
3      A.  It really is up to the chapter what they
4  give and where it goes.
5      Q.  So the chapter can dispose of its own
6  property however it wishes?
7      A.  That's my understanding.
8      Q.  Without regard to the UDC's rules for
9  disbanded chapters?
10     A.  They -- I know that they request that the
11 minutes go there, but there's also, as I recall, a
12 statement that says that "unless otherwise determined
13 by the chapter"; that's probably not the exact words,
14 but I think that's the meaning.
15         So I guess you could say that there's a
16 suggested standard, but you're not held to follow any
17 straight, hard line is my understanding.  So you --
18 you have the suggested standard, but you also have
19 the option of what to do with that property.
20         I know that Barnard Bee did give Albert
21 Sidney Johnston the cemetery plots that they owned.
22 Those deeds were given to the Albert Sidney Johnston
23 chapter.
24     Q.  And were those owned by Bernard E. Bee as
25 well?

Page 29

1      A.  Yes.
2      Q.  Okay.  I'm going to ask you more about
3  those later on.  But let me continue on with my
4  questions about your complaint.
5          So also continuing on Page 3, in Paragraph
6  No. 6, you indicate the purposes for which the ASJ
7  chapter was formed back in 1932.
8          Do you see where I'm reading?
9      A.  Uh-huh.
10     Q.  And are those -- it looks like four
11 purposes -- are those like the stated purposes of the
12 existence of the chapter?
13     A.  I'm sorry, what number are you looking at?
14     Q.  I'm in Paragraph No. 6.  And I'll just read
15 it.  "The purposes of the chapter being formed were
16 to honor the memory of Confederate veterans"; right?
17     A.  Uh-huh.
18     Q.  "Secondly, to assist the needy family
19 members of Confederate veterans"?
20     A.  Uh-huh.
21     Q.  Okay.  "Third, to record the contributions
22 of women during the war and Reconstruction"?
23     A.  Okay.
24     Q.  And "Fourth, to preserve historic artifacts
25 and locations"?

8 (Pages 26 to 29)

Hoffman Reporting _ Video Service                              210) 736-3555
Electronically signed by Pamela Peterson (201-396-129-9161)    619a3864-618d-4c8c-b156-f71c0e39310f

Page 34

1   A. Right.
2   Q. All right. Moving back one page to
3   Page 52, we have an August 28th e-mail?
4   A. Uh-huh.
5   Q. And that obviously was preremoval; correct?
6   A. Uh-huh.
7   Q. All right. And RT51 is dated August 7th,
8   that is also preremoval?
9   A. Uh-huh.
10  Q. That's an e-mail from you to various --
11  A. Council members, uh-huh.
12  Q. Yeah.
13      And RT50 appears to be the same thing as
14  RT53.
15  A. Yeah, it does.
16  Q. To me. Does it appear so to you?
17  A. Uh-huh, just the print looks smaller.
18  Q. Yeah.
19      And then the first page of the packet,
20  RT49, to me -- well, it's different than -- yeah,
21  that's a separate e-mail; correct?
22  A. From September 5th to September 1st?
23  Q. Yeah. RT49 is not duplicated anywhere else
24  in Exhibit T-3, is it?
25  A. I don't think so.

Page 35

1   Q. All right. So do you recall having sent
2   any other e-mails to the City, besides the ones that
3   I have here, except for the ones that were exchanged
4   with the -- with the Clerk's office?
5   A. Not that I recall.
6   Q. Okay. So I want to take you to the first
7   one that you sent. It was August 7th, and it's RT51.
8   A. I'm sorry, RT --
9   Q. RT51.
10  A. Okay.
11  Q. So there's handwriting at the top
12  that says, "To all Council members"?
13  A. Uh-huh.
14  Q. Whose handwriting is that?
15  A. That looks like mine.
16  Q. Okay. And then there's a "Yoakum National
17  Bank"?
18  A. I have no idea what that is there for.
19  Q. Okay. Did you put that there?
20  A. No.
21  Q. Okay. It just ended up there?
22  A. I don't even know what that is.
23  Q. Okay. What was the purpose -- what was
24  your purpose in sending this e-mail?
25  A. You know, I think I felt like the Council

Page 36

1   members maybe didn't understand the true meaning of
2   the monument, and that they needed to know that. No
3   one had ever asked us, and so I -- I sent this,
4   hoping that receiving the correct information from
5   the organization that placed the monument there would
6   be helpful in making a fair decision about what it
7   was they were trying to do.
8   Q. This was educational?
9   A. Yes.
10  Q. Okay. You don't indicate anywhere in this
11  e-mail that you believed that your organization owned
12  the monument, do you?
13  A. Not in that. No.
14  Q. Or that your organization owned the time
15  capsule; correct?
16  A. We -- I never mentioned the time capsule
17  because I was concerned about its safety; so that, I
18  didn't mention until they started taking it down.
19  And I tried calling to inform them that the time
20  capsule existed before something would happen to it.
21  Q. So prior to removal there was never any
22  assertion of ownership of the time capsule --
23  A. No mention of the time capsule at all.
24  Q. Okay. And in this Exhibit T-3, Page RT51,
25  you don't indicate that your chapter owns any

Page 37

1   property in Travis Park either?
2   A. Not in these e-mails. I had communication
3   with Jackie Salvador; and my understanding was that
4   this information was going to -- was going to the
5   City. So I kind of saw it separate communication,
6   that these e-mails were to try to educate on the
7   meaning of the monument. And that the legal aspect
8   of it was already being addressed through the
9   information that I was sending to the Archives
10  Department.
11  Q. Okay. So there is nothing in the e-mail
12  that you sent to the Council members indicating that
13  your chapter was asserting an ownership interest in
14  the park?
15  A. No, I -- no.
16  Q. Okay. And is it your belief that your
17  e-mail -- the e-mails that you exchanged with
18  Miss Salvador indicated an assertion by you that your
19  chapter owned some type of a possessory interest --
20  A. Yes.
21  Q. -- in Travis Park?
22  A. Yes.
23  Q. And is it -- is it your testimony that the
24  e-mails that you exchanged with Miss Salvador also
25  expressed your contention that the chapter had an

10 (Pages 34 to 37)

Robin Terrazas                                        Albert Sidney Johnston v. City of San Antonio

**Page 38**

1  ownership interest in the monument itself?
2      A. I'd have to look back at that. I don't
3  remember the ...
4      Q. Okay.
5      A. But I definitely made it clear that we had
6  an interest in it. I don't remember if there was --
7  ownership was ...
8      Q. Okay. The next page of T-3 is RT52. And
9  that was another preremoval e-mail from you to the
10 City's decision-makers; is that correct?
11     A. Yes.
12     Q. Okay. Was the purpose of this e-mail
13 different than the purpose of your August 7th e-mail?
14     A. I would say it was different, yes.
15     Q. Okay. So what was the purpose of this one
16 that was different than the purpose of the August 7th
17 e-mail?
18     A. I just got -- I felt by this time that it
19 didn't seem to matter to them what the truth of the
20 monument was; and that what they were basing their
21 decision on had more to do with their own
22 interpretation of what they thought about the
23 monument and the people who put it there. And I felt
24 that they were basing it on racism, which did not
25 exist.

**Page 39**

1      Q. Okay. Do you think that there can be more
2  than one interpretation of what the monument means?
3      A. Depending on what you know about the
4  monument.
5      Q. Even with perfect knowledge, do you think
6  there can be differing interpretations?
7      A. For as many individuals as there are in
8  this world, that's how many opinions and views there
9  will be in this world.
10     Q. Okay. So apparently by the time that you
11 wrote this e-mail it appeared to you -- and I'm going
12 off of the first sentence of the text of the
13 e-mail -- that you believed that the City had decided
14 to move the statue from Travis Park anyway; is that
15 more or less true?
16     A. That's the way it was looking.
17     Q. Okay. And you advised -- if you look about
18 two-thirds of the way down the text, there's a
19 sentence that begins on the right with "You are
20 joining into a very dangerous practice"?
21     A. Uh-huh.
22     Q. So what is it that -- what is it that you
23 think the City was missing there?
24     A. I think they were trying to blame what
25 happened in Charlottesville, or use that incident as

**Page 40**

1  a reason to move this one.
2      And if that was the case, then what they
3  were saying was that we will give into violence. If
4  people want to be violent in order to get what they
5  want, that they would be willing to give into that.
6      And that's dangerous, because if you are
7  going to allow violence to rule rather than stand up
8  and say, "Let's bring the two sides together. Let's
9  have an understanding. Let's not jump into something
10 here," then really you're empowering those people who
11 are being violent.
12     Q. You go on to say that -- that "The war was
13 really one of independence"?
14     A. Yes.
15     Q. And what do you mean by that?
16     A. I mean that the war -- the war
17 started -- the war -- the war between the States or
18 the Civil War was not started over slavery.
19 President Lincoln and Jefferson Davis both stated
20 that the war was not about slavery. Lincoln wanted
21 to hold the Union together, and Davis wanted the
22 States' rights. There were issues that they were
23 fighting over. Did slavery exist? Yes. Did it
24 become a part of the war? Yes. But that's not why
25 the war was started.

**Page 41**

1      Q. Okay. So four lines, five lines up from
2  the bottom, you indicate that "The monument
3  represents a time that none of us wants to live"?
4      A. Uh-huh.
5      Q. I'm not sure what you meant by that. Could
6  you explain that?
7      A. Well, none of us wants to get into a civil
8  war. None of us wants to have to fight brother
9  against brother or father against son. And, of
10 course, none of us wants to see slavery. That's not
11 an acceptable thing.
12     Q. Okay. I -- that makes perfect sense. I
13 just don't think that I read that clearly when I read
14 it.
15     But you go on to say that "The monument
16 honors those who died for what they believed in"?
17     A. Yes.
18     Q. "And it was not slavery that they were
19 fighting for"?
20     A. Right.
21     Q. Okay. So it would matter, then, what the
22 reason was for -- you know, for the war itself, in
23 that respect?
24     A. I'm sorry. What --
25     Q. Okay. You were explaining earlier what you

11 (Pages 38 to 41)

Hoffman Reporting _ Video Service
Electronically signed by Pamela Peterson (201-398-129-9161)
210) 736-3555
619a3864-618d-4c8c-b156-f71c0e39310f

## Page 46

1   Q. Okay. Do you think there's anything wrong
2   with -- with trying to distance yourself from things
3   associated with slavery?
4   A. No.
5   Q. Okay. Was there any other -- well, let me
6   ask you this.
7       In the lead-up to the removal of the
8   monument, did you hear any City personnel mention the
9   Albert Sidney Johnston chapter?
10  A. No.
11  Q. Did you hear any City personnel mention the
12  Bernard E. Bee chapter of the United Daughters of the
13  Confederacy?
14  A. Not that I recall.
15  Q. Do you recall hearing any City official
16  even reference the United Daughters of the
17  Confederacy with respect to the removal?
18  A. Not by name, the people who put it there.
19  Q. Okay. And no one mentioned you personally?
20  A. No, not that I know of.
21  Q. When you spoke -- did you speak at City
22  Council in the lead-up to the removal?
23  A. Twice.
24  Q. Okay. Did you identify yourself as a
25  member of the chapter?

## Page 47

1   A. I -- as the president of the chapter, yes.
2   Q. Okay. Was there anything said to you with
3   respect to your membership or office -- being an
4   officeholder in the chapter?
5   A. City Council's not allowed to speak to the
6   speakers, so no one said much of anything to me.
7   Q. Okay. You had other conversations with
8   City personnel, as well, with respect to the monument
9   removal, outside of these e-mails and outside of the
10  e-mails that you sent to Miss Salvador; true?
11  A. Yes.
12  Q. All right. Who did you talk to?
13  A. I talked to the policy advisor, Marisa
14  Bono, I think is her name, briefly; just that I had
15  concern, mainly, that I was trying to speak with
16  Mayor Nirenberg.
17      And she said to go to City Council hearing,
18  that that was the -- really, the only opportunity I
19  was going to have to speak with him.
20      When it became clear that I wasn't going to
21  be able to set an appointment with him, I went down
22  to City Hall and I spoke with his secretary, Alice.
23  And, actually, that was prior to talking to Marisa
24  Bono, because Alice did say that she couldn't
25  promise, but that it looked like the best she could

## Page 48

1   do was that the policy advisor would call me, which
2   she did call me and basically said, "Go to the City
3   Council hearing."
4       But when I spoke to Alice, I -- she gave me
5   a form to fill out about wanting to meet with the
6   mayor; and I was so nervous that I couldn't write.
7   And so then she left and came back. And I told her
8   that I really felt it was very important that I meet
9   with the mayor over this Travis Park issue, because I
10  knew they were getting ready to vote and I was afraid
11  that we would not have the chance to talk; that I
12  felt that there was a possible legal issue regarding
13  the land at Travis Park, and it -- we needed to
14  discuss this.
15      And that's when she left and came back
16  again and said that at the very least she thought
17  that the policy advisor would call me, but that the
18  mayor was not -- it was pretty clearly he wasn't
19  going to meet with me.
20  Q. So the conversation that you just
21  described, was that with Alice or with Miss Bono?
22  A. That was with Alice.
23  Q. Okay. What's Alice's last name?
24  A. I have no idea.
25  Q. Fair enough.

## Page 49

1   A. It's his secretary.
2   Q. And you told her at that time that there
3   was an issue with respect to a legal issue?
4   A. Yes.
5   Q. What legal issue was that?
6   A. Regarding the land in Travis Park.
7   Q. Okay. And she advised you to go talk to
8   City Council?
9   A. No, Alice said that -- well, she went to
10  see if -- my understanding was she went to see if the
11  mayor was going to meet with me, which he said "No"
12  or who -- however she determined, it was "No," but
13  that maybe the policy advisor would call me. So I
14  don't know exactly what happened behind the closed
15  doors there, but she just said that the mayor is not
16  going to be able to meet with me, and that the policy
17  advisor would probably be giving me a phone call.
18  Q. And did you receive a call from the policy
19  advisor?
20  A. Right, yes, she did call. And she
21  basically said, "Go to the City Council hearing."
22  Q. And did you do that?
23  A. Yes.
24  Q. And did you bring up the legal issues that
25  you wanted to discuss with the mayor?

13 (Pages 46 to 49)

Hoffman Reporting _ Video Service                                210) 736-3555
lectronically signed by Pamela Peterson (201-396-129-9161)       619a3864-618d-4c8c-b156-f71c0e39310f

**Page 50**

1   A. No.
2   Q. Why not?
3   A. Because I didn't feel that that was the
4   place to do that.
5       I believed that the information that I had
6   given to Salvador was going to City — going to the
7   City Council. And I just didn't feel that that was
8   the forum to be having a legal discussion; not to
9   mention that the mayor was not going to answer me
10  back or ask me questions, what I really needed.
11      So I did say that they hadn't asked us
12  about anything or discussed anything with us, but I
13  don't — I didn't go any further than that.
14      Then after the meeting is when I went up
15  and said, "Let's work together."
16      He said, "Yes, let's definitely work
17  together."
18      So I felt this was the beginning of a long
19  process and a long conversation. I had no idea, no
20  anticipation, that they would begin taking it down
21  the minute that they voted. I felt even if they
22  voted to take it down, he had promised me we would be
23  involved with it, so then at that point we could
24  start working together on "Let's talk about what's
25  going to happen from here on out." But there was no

**Page 51**

1   chance for that because they immediately started
2   taking it down.
3       When — when I realized that they were
4   there taking it down — and, of course, they didn't
5   know about the time capsule — the offices were
6   closed. Miss Bono had called me from her cell phone
7   when she called, and so that was the only number I
8   had outside of the office.
9       So I called her cell-phone number and I
10  left two messages, I think one was that night and one
11  was the next morning, telling her, "There's a time
12  capsule. There's a time capsule." There — this —
13  you know, "You need to know about this."
14      No response from anybody. So the next
15  morning I called over to City Council, to the City
16  Hall, and I talked to Alice again. And I said I was
17  calling to let — talk about — talk to the mayor,
18  and that there was this time capsule.
19      And she said, "Well, everybody's gone.
20  It's a holiday. They're all gone until — through
21  Monday." So I took it Tuesday they were coming back.
22  She said, "I recommend that you send him an e-mail."
23      So that's why it's in this e-mail, because
24  I had no other way to try to tell him, "There's a
25  time capsule here." I tried calling the policy

**Page 52**

1   advisor, left her cell messages. Called City Hall,
2   he wasn't there. Wasn't getting — Alice didn't say,
3   "Oh, let me call him," or "I'll have him call you";
4   it was just, "Send him an e-mail," so that's what I
5   did.
6       Q. So it seems that the time capsule and the
7   parkland possessory interest were very important to
8   you?
9       A. Yes.
10      Q. And the explanation that you've given for
11  not raising that prior to the Council vote was you
12  didn't feel that it was appropriate to talk about
13  those things —
14      A. Not in —
15      Q. — before they voted?
16      A. Not in the City Council hearing.
17      Q. Can you explain why you didn't think that
18  that — that it was an appropriate venue for
19  discussing the things that were important to you?
20      A. Well, because I felt like that wasn't a
21  place for opinion. I was there really more to try to
22  gain public support, because this was the public
23  citizens' hearings; so I wanted to give — give the
24  truth of the monument there, for citizens to hear and
25  for City Council to hear; but I didn't feel it was a

**Page 53**

1   courtroom, where I needed to go in with the legal
2   aspects of it.
3       And again, I tried to contact through the
4   Archives Department and directly through the mayor's
5   office.
6       Q. But you had the opportunity to raise those
7   issues if you wanted to; correct?
8       MR. CRANE: Objection. Asked and answered.
9       MR. FITZPATRICK: I don't think I asked
10  that.
11      THE WITNESS: It didn't seem like the
12  appropriate place.
13      Q. BY MR. FITZPATRICK: Well, the question
14  was, you had the opportunity to raise those issues
15  before Council, but you chose not to; correct? And
16  by "those issues" I'm talking about the possessory
17  interest in the park and the time capsule.
18      A. Well, the time capsule I did not want to
19  bring up in public because I was afraid of someone
20  else trying to get their hands on it; so that didn't
21  feel like a public conversation, for sure, for the
22  protection of the time capsule.
23      And the legal issue seemed like that was
24  something that needed to be discussed in a
25  discussion, not as a public conversation

14 (Pages 50 to 53)

Hoffman Reporting _ Video Service                                    210) 736-3555
Electronically signed by Pamela Peterson (201-396-129-9161)          619a3864-618d-4c8c-b156-f71c0e39310f

Page 62

1    A. I don't know. I mean, I -- I wouldn't say
2    that that proves ownership. It proves that they were
3    still ...
4    Q. Well, let me ask you this. Could someone
5    who didn't own the monument rededicate it?
6    A. That would not make sense.
7    Q. Okay. So continuing on Page 5 of
8    Exhibit T-1, there's an allegation of a rejection of
9    the committee's recommendation?
10   A. I'm sorry, we're on Page 5, did you say?
11   Q. I think we are. I'm not going to say we
12   are. I'm sorry, we're on Page 6. Under Paragraph
13   D – 2(d), "Rejection of the committee's
14   recommendation."
15   A. "Policies" ...
16   Q. Do you see where that's written?
17   A. Uh-huh.
18   Q. Do you know what committee that's referring
19   to?
20   A. No.
21   Q. Do you know what kind of recommendation
22   might have been made or rejected?
23   A. I -- I -- no, I mean, that's not ...
24   Q. And, Ms. Terrazas, that's fine. There may
25   be things in there that -- I mean, you don't have to

Page 63

1    know everything that's in there. I'm just asking
2    you -- I mean, if you know --
3    A. I don't know.
4    Q. Okay. And then on Page 6, under 2(a), it
5    indicates that the monument was on private property
6    or an easement.
7    A. I'm not claiming that it's private
8    property. We've -- we've claimed that we were given
9    the use and the land on -- so it would be more like,
10   I guess, easement would be.
11       MR. CRANE: We'll stipulate that we're
12   not -- plaintiff is not claiming the ownership
13   rights -- fee ownership rights. I wrote this in
14   November; and at the time, I wasn't sure what the
15   ordinance said.
16       MR. FITZPATRICK: Okay.
17       MR. CRANE: But now we do know what it
18   says; so, no, we're not claiming fee ownership.
19   Q. BY MR. FITZPATRICK: So what are you
20   claiming?
21   A. That we have the right for the monument to
22   be in the middle of Travis Park, by ordinance of the
23   City.
24   Q. Okay.
25   A. Not that we own it, but that we were given

Page 64

1    an indefinite right for that statue to be there.
2    Q. And that's the right that we talked about
3    earlier that came from Exhibit T-2, which is --
4    A. Yes.
5    Q. -- the copy -- the certified copy; correct?
6    A. Right, the ordinance.
7    Q. Now, nowhere in there does it say
8    "easement," does it?
9    A. It does not use that term, no.
10   Q. It doesn't use "right," either; correct?
11   A. It grants the use of the amount of land
12   petitioned for in the center of Travis Park.
13   Q. Okay. And for the granting permission;
14   correct?
15   A. Right.
16   Q. All right. And it was the permission that
17   was asked for?
18   A. Yes.
19   Q. Okay. But my question was, the word
20   "right" is never used in this document, is it, like
21   granting a right?
22   A. No.
23   Q. Okay. All right. And neither is the word
24   "license"?
25   A. No.

Page 65

1    Q. We already talked about "perpetual,"
2    there's no language in this that indicates that
3    whatever was granted is not revocable; true?
4       MR. CRANE: Objection, calls for legal
5    conclusion.
6       THE WITNESS: It doesn't say in any
7    limitation on there.
8    Q. BY MR. FITZPATRICK: Okay. Including any
9    limitation on the right to revoke whatever was
10   granted, would that be your understanding?
11   A. It -- I clearly read from this that the
12   land -- the use of the land was given to the
13   Daughters of the Confederacy. And it doesn't say
14   "until a certain point" or -- it just says that it
15   can go.
16       And knowing the size of the monument and
17   the fact that the City engineer prepared everything
18   for that, that it was intended to remain.
19   Q. Okay. And I understand that we have
20   differing interpretations of what this means. But
21   what I'm asking you specifically is can you show me
22   any language in this certified copy that's
23   Exhibit T-2, that suggests that whatever was granted,
24   whoever's interpretation is correct, is not
25   revocable?

17 (Pages 62 to 65)

Hoffman Reporting _ Video Service                      210) 736-3555
Electronically signed by Pamela Peterson (201-396-129-9161)    619a3864-618d-4c8c-b156-f71c0e39310f

Page 66

1   A. There's nothing that says.
2   Q. Okay. Is there any language in that
3   exhibit that suggests that whatever right was granted
4   is transferable to anyone else?
5   A. Well, it says the United Daughters of the
6   Confederacy, which still exists; so the Daughters of
7   the Confederacy.
8   Q. The Daughters of the Confederacy aren't a
9   party to this lawsuit, are they?
10  A. Our chapter is, yes.
11  Q. Right. So in Exhibit No. T-1, you are
12  asking for damages; correct? I am looking at Pages 8
13  and 9.
14      So if you look under paragraph Roman
15  numeral VII, No. 1, you're asking for return of your
16  property; correct?
17  A. Uh-huh.
18  Q. And that property is the property we've
19  been talking about, the monument?
20  A. Right, the monument and the time capsule
21  that was inside of it.
22  Q. And the time capsule. All right.
23      What about -- what about the property in
24  Travis Park?
25  A. Well, what we're asking for is that the

Page 67

1   property goes back to Travis Park.
2   Q. Okay. So are you asking for whatever your
3   interest is in Travis Park be restored to you?
4   A. The use of the land for the statue, yes.
5   Q. All right. Now, getting back to
6   Exhibit T-2, do you see anything in that document
7   that says "the use of the land for the statue"?
8   A. Well, it says, "for permission to erect a
9   monument in the Travis Park." And then it says,
10  "Hereby granted -- permission be hereby granted to
11  the Daughters to use the amount of land petitioned
12  for in the center of Travis Park."
13      What was your question again?
14  Q. Let me just move on to a new one.
15      What are the compensatory damages you're
16  looking for?
17  A. I don't know that that can -- well, any --
18  any damage that was done to the monument as a result
19  of the move, to be repaired.
20  Q. That's assuming you get the monument back;
21  right?
22  A. Yeah, I don't know how to answer that.
23  Q. Well, I mean, you're making a taking claim,
24  which means that we took your property and it's ours
25  now.

Page 68

1   A. Right.
2   Q. And that we owe you the market value, so --
3   A. Well, what we really want is the monument
4   put back in Travis Park; so we don't need -- if this
5   is all -- it would be after the fact of, "Okay, now
6   we're not going to honor this," then it becomes ...
7   Q. Well, let me ask it this way.
8       Assuming that the City were ordered to give
9   you the monument back and put it back in Travis
10  Park --
11  A. Uh-huh.
12  Q. -- what damage are you looking for -- what
13  monetary damage are you looking for at that point?
14  A. At that point we would want any damage that
15  was done to the monument, or the cost of putting it
16  back up, all to be paid for by the City.
17  Q. Okay.
18  A. So any restoration and replacement of
19  putting it back in the Park, to all be paid for by
20  the City.
21  Q. Now, we heard Mr. Schlitzberger's
22  testimony, where he estimated the replacement value
23  of the statue; correct?
24  A. That was to recreate it; but that wouldn't
25  be the value of that particular monument, of the

Page 69

1   artist, you know, Teach.
2   Q. Okay. But he didn't give a -- he didn't
3   give an opinion as to how much it would cost to
4   repair any damage to the statue; right?
5   A. No, I don't think so.
6   Q. Okay. Do you have that figure?
7   A. I don't.
8   Q. All right. Now, let's say that the City of
9   San Antonio were to not give you back the statue, but
10  keep it, what is the amount of damages that you're
11  looking for in that instance?
12  A. I can't say that's been my thought, because
13  my thought is that this is about the monument going
14  back to Travis Park.
15  Q. You indicated in your interrogatory
16  response that you want to recover for untrue things
17  that were said about your members. Do you recall
18  giving that answer?
19  A. No, but I'll take it.
20  Q. Are you in fact looking to recover for
21  that?
22  A. I think what I would like to see is for the
23  City simply to help repair that.
24  Q. What amount of damage -- monetary damage --
25  do you think is appropriate for the untrue things

Page 94

1  aware of that supports Miss Oldham's statement
2  concerning City Council giving permission and a
3  perpetual place in Travis Park to erect the monument?
4      A.  You know, if we could find the minutes from
5  that time period; and if we could find the petition
6  that was written by the Daughters to the City, I
7  would think that that would answer these -- some of
8  these questions. But that I've seen, no.
9      Q.  Okay. And I think that I'm about to rap
10 up. Can I have like 30 seconds to look over some
11 materials? And I have maybe two questions for you
12 that I know of right now.
13     A.  Okay.
14         MR. CRANE: Yeah. And I'd like to ask a
15 couple follow-up questions, if you have time.
16         THE WITNESS: Okay.
17         (A brief recess was taken.)
18     Q.  BY MR. FITZPATRICK: Is it your contention
19 that the City broke the tip of the rifle off during
20 the removal of the statue from Travis Park?
21     A.  The tip of it? I don't know. I'd have
22 to -- I'm -- any damage that was done, I would say
23 we'd have to just compare photographs to the statue
24 prior to its take-down; and then any damage that now
25 exists.

Page 95

1       Q.  Okay. I will reserve any remaining
2  questions till the time of trial.
3       A.  Okay.
4
5              EXAMINATION
6  BY MR. CRANE:
7       Q.  Robin, I just have a couple of questions.
8  If you could pull out the Exhibit T-1,
9  that's the complaint.
10      A.  (Witness complies.) I see T-2 on here.
11      Q.  This is T-1, right here.
12      A.  I'm just getting everything organized.
13      Q.  Well, it's good to keep it together,
14 because the court reporter will definitely need
15 those.
16      A.  Yeah. Okay, so T-1.
17      Q.  If you look and turn to Page 4, and look at
18 Paragraph 12.
19      A.  Okay.
20      Q.  Mr. Fitzpatrick asked you questions about
21 the City Council and I think his phrase was, "Did
22 anyone at the City ever use the term 'racist'?" I
23 understood your answer eventually to be no, not that
24 you recall.
25      But do you recall statements that caused

Page 96

1  you to believe -- let me rephrase that.
2       Did you believe, back in August of 2017,
3  that persons who are employed by the City were using
4  inaccurate terminology to talk about the Confederate
5  statue?
6       A.  Yes, I feel the way that they talked about
7  the statue, the way they presented, implied racism
8  and implied blame on anyone who supported the
9  monument.
10      Q.  Do you remember what phrases somebody at
11 the City used? You mentioned one. One was "those
12 people who put it up"; is that right?
13      A.  Right. Trevino's comment, "The people who
14 put it there," and just the way that he said it.
15      Q.  Do you remember --
16      A.  And then --
17      Q.  Sure. Do you remember anything else by him
18 or of the mayor?
19      A.  No, I think a lot of it that the mayor said
20 was in writing on his thing. And, too, just the way
21 that I feel that they -- they allowed people to talk
22 against the monument and those in support of.
23      Q.  Does -- in your view, does the Confederate
24 memorial represent the Confederate States of America?
25      A.  No, it supports those that died defending

Page 97

1  their homes and families.
2       Q.  When the mayor was making his remarks about
3  "a lost cause" was he talking about the Confederate
4  memorial in Travis Park?
5       A.  He was -- it seem -- yes, he was referring
6  to the monument.
7       Q.  When you appeared at the Citizens to be
8  Heard meetings, did I understand you correctly, did
9  you do that twice?
10      A.  Yes.
11      Q.  Can you describe briefly how that works,
12 Citizens to be Heard?
13      A.  You -- so you go and you have -- you have
14 to sign up before you go. And then you're given
15 three minutes to speak, or they reserve the right to
16 give you less time if they feel that there are too
17 many people, or so many people speaking, then they
18 need to decrease that time.
19      So the first time I spoke, I did have three
20 minutes. The second time I spoke, I had two minutes.
21      Q.  And when you -- after you speak, does the
22 mayor or the members of the City Council, do they ask
23 you questions about what you just said?
24      A.  They're -- no, they don't. In fact, I
25 believe it was Mayor Nirenberg explained to someone

25 (Pages 94 to 97)

Hoffman Reporting _ Video Service                                                210) 736-3555
Electronically signed by Pamela Peterson (201-396-129-9161)                     619a3864-618d-4c8c-b156-f71c0e39310f

## Page 98

1  who tried to ask him a question that they were not
2  there to -- to say anything, make comments, answer
3  questions; they were just there to listen.
4      Q.  Did you feel like that was a good place to
5  talk about a complicated legal issue?
6      A.  No.
7      Q.  And why not, ma'am?
8      A.  Because you can't have a dialogue, you
9  can't -- I couldn't ask him a question or have any
10 meaningful conversation.  I mean, I couldn't have any
11 conversation at all with him regarding anything.
12     Q.  I want to ask you a different topic.  The
13 Barnard Bee chapter transferred items or interests to
14 the Albert Sidney Johnston chapter.
15         To your knowledge is -- well, let me back
16 up.  You're president of the Albert Sidney Johnston
17 chapter.  Is the next higher level for you the Texas
18 Division of the Daughters of the Confederacy?
19     A.  Yes.
20     Q.  So your higher-up would be whoever is in
21 charge of the Texas Division?
22     A.  Yes.
23     Q.  When the items or property was transferred
24 from the Bee chapter or to the Johnston chapter, to
25 your knowledge was Texas Division satisfied with how

## Page 99

1  that transfer occurred?
2      A.  The --
3          MR. FITZPATRICK:  Objection.
4      Q.  BY MR. CRANE:  You can -- well, go ahead
5  and answer.
6          Were they satisfied with that transfer, as
7  far as you know?
8      A.  As far as I know.
9      Q.  Did the Texas Division ever say to you
10 something wasn't right about that?
11     A.  No.
12     Q.  Did -- has the Texas Division ever said to
13 you, "Hey, wait, you don't own it.  Texas Division
14 owns the statue that used to be in Travis Park"?
15     A.  No.  No, they consider us the owners.
16     Q.  Has Texas Division ever sent you a letter
17 or an e-mail or a telegram saying, "You guys can't
18 own those lots in the cemetery, we have to own them"?
19     A.  No.
20     Q.  I have no other questions until trial.
21 Thank you.
22
23         FURTHER EXAMINATION
24 BY MR. FITZPATRICK:
25     Q.  Actually, I have some follow-ups.

## Page 100

1          You just testified in response to your
2  counsel's questions, that you believe that the City
3  representatives used inaccurate terminology
4  discussing the monument.  Do you recall saying that?
5      A.  I feel they implied -- their implications
6  were ...
7      Q.  Okay.  You believe that there were
8  implications of racism; right?
9      A.  Yes.
10     Q.  That's what you said.  There was never a
11 mention of racism, though; correct?
12     A.  It seems that there was.
13     Q.  By -- by City representatives?
14     A.  I recall thinking so.
15     Q.  Okay.  Do you recall -- I mean, we went
16 over this earlier in your deposition, and you didn't
17 recall any then.
18         Are you -- do you think that you might
19 recall some now?
20     A.  I don't.  I just remember feeling over and
21 over that they were pointing to the monument as being
22 racist, and supporting the idea that anyone who
23 supported the monument would be racist.
24     Q.  And I think that that term that you used,
25 "feeling," is important here.  Do you know the

## Page 101

1  difference between an inference and an implication?
2      A.  Explain.
3      Q.  Well, so an implication is something that
4  is intended to carry a certain meaning.  And an
5  inference is something that is gleaned by the
6  receiver as carrying a certain meaning.
7          And it sounds to me when you're describing
8  your feeling, you were describing how you received
9  the information rather than how --
10     A.  No, I feel that they purposely were trying
11 to present it that way.
12     Q.  Okay.  Tell me exactly what they said that
13 presented it that way, and tell me what "that way"
14 means.
15         Well, let's start with, tell me exactly
16 what "that way" means.
17     A.  I think that they were purposely trying to
18 paint the monument or memorial as racist.  And I
19 think they were purposely trying to paint the
20 supporters of it remaining as being racist.
21     Q.  Okay.  And what did they say to try to
22 paint that picture?
23     A.  Well, if you go back to what
24 Mayor Nirenberg put on his website, the things he
25 said there; and then Trevino saying "the people who

26 (Pages 98 to 101)

Hoffman Reporting _ Video Service                              210) 736-3555
Electronically signed by Pamela Peterson (201-396-129-9161)    619a3864-618d-4c8c-b156-f71c0e39310f

Exhibit T3

From: Robin Terrazas <robinlmusic@aol.com>
To: ron.nirenberg <ron.nirenberg@sanantonio.gov>
Bcc: mccammon <mccammon@beecreek.net>
Subject: UDC involvement and property
Date: Fri, Sep 1, 2017 9:15 am

Mayor Nirenberg,

Wednesday night you looked me in the eye, shook my hand and assured me that you would work with us regarding the monument. I have not heard from you since, yet you have already moved the monument (or are in the process of) and not communicated a thing. There are items in the base of the monument that I believe should be returned to the UDC immediately for safe keeping. These are things that could easily be transported and not require a large space for storage. I had hoped and believed that, even with a vote to move the monument, we could have worked on a plan regarding the removal and new placement. Removing it in the middle of the night without a plan is irresponsible and shows absolutely no respect for our organization. As I have stressed to you before, we are not racist, we do not support white supremacy, we want to work with the city and yes, preservation of our true history, is a top priority. You have yet to show me that you have any intention of being "all inclusive" when you have acted in this manner. I am deeply disappointed by your actions and hope that you will be in touch soon so that we can move forward together.

Sincerely,
Robin Terrazas
Chapter President, ASJ 2060, UDC



RT000049


From: Robin Terrazas <robintmusic@aol.com>
To: ron.Nirenberg <ron.Nirenberg@sanantonio.gov>; bruce.davidson <bruce.davidson@sanantonio.gov>; Maria.cesar <Maria.cesar@sanantonio.gov>; citymanager <citymanager@sanantonio.gov>
Subject: UDC Monument belongs to our chapter, not the city
Date: Tue, Sep 5, 2017 1:02 pm

Mayor Nirenberg,

The one and only time you have acknowledged my attempts to reach you was the night prior to your vote regarding the UDC monument in Travis Park. You shook my hand and assured me you would include us in the relocation of the monument. The next day you voted to move it and immediately began the process without any communication with me. Though you may have had the right to no longer house the monument at Travis Park (which is still questionable considering no proof of deed was ever produced), you did not have the right to move it without coordination with the UDC chapter in San Antonio who was named successor of the Barnard Bee chapter that placed the monument. Our organization was given permission by the city in 1899 to place the monument which it paid for (both the monument and all costs associated with placement). At no time was the monument given to the city. Furthermore, as I have communicated to your policy advisor by voicemail the night of removal and the following morning, there is a time capsule that rightfully belongs to us that should not be disturbed without our planning and involvement. I have also communicated this to you via email on Friday as crews continued working on the removal. No one has answered my concerns. I do not believe the city has the right to decide what happens to the monument and must be held responsible for it remaining in good condition. I feel it is important that our organization is allowed to see the monument to assess its condition. Any further movement of the monument should be coordinated with the Albert Sidney Johnston 2060 chapter of the UDC and paid for by the city who prematurely moved it. I have most recently tried calling your office this morning with no response from you.

Robin Terrazas
Chapter President, Albert Sidney Johnston 2060, UDC
210-273-7418

RT000050

*Sent to all Councilmembers*

From: noreply <noreply@sanantonio.gov>
To: Alice.Aguirre <Alice.Aguirre@sanantonio.gov>
Cc: robintmusic <robintmusic@aol.com>
Subject: Online Feedback Submission:Travis Park
Date: Mon, Aug 7, 2017 6:20 pm

## Contact Us

**Name:** Robin Terrazas
**Phone Number:**
**Email:** robintmusic@aol.com
**Contact Pref:** Email
**Subject:** Travis Park
**Comments or Question:** Facts you should know about Travis Park and its Monument. Travis Park was donated to the city in the 1870s by former mayor Samuel Augustus Maverick. His wife Mary was one of the women who worked to have the monument placed. The property, now Travis Park, once served as a Confederate Hospital. The monument was paid for by many small, nickel and dime, local contributions of an impoverished population. Most interesting about the contributions is that they were received from citizens who had worn the "blue" and those that worn the "grey". The monument was designed by a woman, Miss Virginia Montgomery. Historically, it was the first monument in this country ever designed by a woman. It was the first monument ever placed here in San Antonio. The purpose of the monument is to honor all Confederate veterans who died during the war... not only white, but Hispanic, Black, and Native American. The front of the monument reads "Confederate Dead." On the rear it reads "Lest We Forget." This phrase, "Lest We Forget" comes from a poem written in 1897 by Rudyard Kipling entitled "Recessional." The poem points to a tumultuous past and the importance of remembering God. The tumult and the shouting dies The Captains and the Kings depart Still stands Thine ancient sacrifice An humble and a contrite heart Lord God of Hosts, be with us yet Lest we forget – lest we forget When this monument was placed in 1899, the south was in the midst of a long recovery from a tumultuous past. Many friends and family had died fighting for their communities, and the rest were left with the tremendous job of rebuilding. Yes, the Confederacy lost, but the south remains dedicated to this great country. We are not an uncivilized society like other places in the world where they destroy ancient statues and cities – places the world has condemned. History should not be erased by the taking down of Veteran Monuments, especially when they are part of our very own American history. This ever important memorial of those who fought, died, and suffered as a result of war should serve as a reminder that war is devastating. Even more so when it is fought in your home. Our country has come a long way since this monument was placed. And progress will continue to be made. Let's keep our history alive and move forward with mutual respect. Let this monument continue to honor those who were willing to stand up for what they believed in, and at the same time, serve as a benchmark and educator of history. May your legacy be treated the same as you treat the legacy of those who came before you.

**Yoakum National Bank**
www.yoakumnationalbank.com

RT000051

From: noreply <noreply@sanantonio.gov>
To: district2 <district2@sanantonio.gov>
Cc: robintmusic <robintmusic@aol.com>
Subject: Online Feedback Submission:Travis Park Monument
Date: Mon, Aug 28, 2017 2:50 pm

## Contact Us

Name: Robin Terrazas
Phone Number:
Email: robintmusic@aol.com
Contact Pref: Email
Subject: Travis Park Monument
Comments or Question: It seems you have decided to move the statue from Travis Park without any further consideration from the public. I hope I am wrong, but should you be planning to do so, remember that though this may not be your heritage, you do HAVE one, and it is not without blemish. If you are to hold the standard of only monuments for perfect people, then no monument can stand except for one of Jesus Christ. However, because you are supposedly worried about offending people, then that cannot stand either because there are non Christians living in this country. You are joining in to a very dangerous practice of censorship in this country and actively supporting false history. Though slavery was an issue during the war, it was really of war of independence just like the Revolutionary War and Texas wars. Though some extreme racists have tried to use confederate icons for their own, they are criminals who do not represent true historians. You are giving in to 2 sides of violence and leaving out the true moderate Americans who support and understand the truth. You are a coward if you cannot and will not stand up for the truth, and the truth is that the monument is not racist, it represents a time none of us wants to live and it honors those who died for what they believed in......and it was not slavery they were fighting for. Even Robert E Lee did NOT own slaves. Either way you are making history. Please stand for the truth, not violent offenders who try to bully their way through this country.

RT000052