EXHIBIT F
ROBIN TERRAZAS AS THE ALBERT SIDNEY
JOHNSTON CHAPTER
DEPOSITION

```
                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
                        SAN ANTONIO DIVISION

ALBERT SIDNEY JOHNSTON        )
Chapter No. 2060, United      )
Daughters of the              )
Confederacy, ROBIN            )           ORIGINAL
TERRAZAS, President, JEAN     )
CAROL LANE, First             )
Vice-President,               )
       PLAINTIFFS,            )
                              )
VS.                           )  CIVIL ACTION NO.
                              )  SA-17-CV-1072-DAE
THE CITY OF SAN ANTONIO,      )
       DEFENDANT.             )
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

ROBIN TERRAZAS, AS REPRESENTATIVE OF

ALBERT SIDNEY JOHNSTON CHAPTER NO. 2060

SEPTEMBER 21, 2018

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION of ROBIN TERRAZAS, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 21st day of September, 2018, from 12:58 p.m. to 1:44 p.m., before Sharon L. McDonald, CSR, in and for the State of Texas, reported by machine shorthand, at the Law Offices of the Thomas J. Crane, 110 Broadway, Suite 420, San Antonio, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

```
 1      Q     Okay.  So I'm specifically asking about the
 2  land.
 3      A     Uh-huh.
 4      Q     Just to be real clear here.
 5      A     Right.
 6      Q     Because I'm not sure I asked that question
 7  clearly.  So I think my last question was:  Where did the
 8  chapter obtain the interest in the land?
 9      A     Interest as in -- again, it's not interest in
10  the land to do whatever they want to with it.  It's
11  interest in the land for the statue to remain in Travis
12  Park.  And it comes through the ordinance which states
13  United Daughters of the Confederacy -- Barnard Bee was
14  the chapter at that time who made this happen, but then
15  they transferred responsibility verbally to the Albert
16  Sidney Johnston Chapter as well as presenting the copy of
17  the ordinance.
18      Q     So, essentially, you're contention is that it
19  was the ordinance that created that interest?
20      A     Yes.  The ordinance is what gives the United
21  Daughters of the Confederacy as a whole -- it says,
22  United Daughters Confederacy -- the right for that statue
23  to be in the middle of the park.  That occurs because of
24  the efforts of the Barnard Bee Chapter who when they
25  disbanded essentially asked Albert Sidney Johnston 2060
```

```
 1  to be watchful over the statue which sits in Travis Park.
 2      Q     Was there anything other than the ordinance that
 3  you mentioned that created the interest in --
 4      A     For the land.
 5      Q     -- for the land in Travis Park property?
 6      A     No.  It's all based on that ordinance.
 7      Q     And what -- I think you've already kind of
 8  answered this, but what does the interest entitle the
 9  chapter to do with the land?
10      A     Put the statue there.
11      Q     And does it allow anything else that you're
12  aware of?
13      A     No.  It specifically states for the statue.
14      Q     And what is the chapter's contention with
15  respect to the duration of the chapter's interest in
16  Travis Park property?
17      A     Basically it would be eternal.  There's no --
18  nowhere that says anything of any reason that it would
19  ever be removed.
20      Q     And does the chapter claim any other right in
21  Travis Park land than what you've described so far?
22      A     No.  Just for the statue to be there in the
23  center of the park.
24      Q     And is it ASJ's -- I'm sorry -- the chapter's
25  contention that the property interest was conveyed by
```

1    A    Right.  1899 was the ordinance.

2    Q    All right.  So we'll go with 1899.

3    A    Okay.

4    Q    Does the chapter contend that the City made any
5 other representations concerning the Travis Park land
6 beyond what's in the document?

7    A    I know there, at some point, they did have
8 discussions of what they wanted to do with the park
9 around that time and they did defer to that the ladies of
10 the UDC would not approve anything different because they
11 had already been promised the use of that land for the
12 statue.

13         So in some places it does insinuate that
14 maybe they had more interest even than just for the
15 statue or that they had -- it showed that they had, I
16 guess, the right to say whether or not the statue would
17 still go there, and they knew that they wouldn't want it
18 any other way, but I can't tell you exactly where that
19 was.  I just know that there were City conversations
20 regarding that.

21   Q    Okay.  And when were the City conversations that
22 you're referring to?  When did those happen?

23   A    That was around the time that the monument went
24 up.  I'm thinking it might have been after the
25 cornerstone was laid, but they had not yet put up the

 1   actual statue.  And they were wanting to build a library
 2   that they -- it seems like it was the federal government
 3   was giving them money to build a library, and they were
 4   considering putting that it Travis Park, but they had
 5   already promised that to the UDC.  And so in those
 6   conversations, they were very mindful of the fact that
 7   UDC was not going to want to change their plans.
 8        Q    Okay.  So you're referring to conversations or
 9   comments or statements that occurred after the property
10   interest was created, correct?
11        A    Uh-huh.  After 189 -- it would have been after
12   the ordinance had been placed in 1899.
13        Q    So specifically what I'm asking is:  Does the
14   chapter know of any other representations that were
15   communicated by the City of San Antonio to any recipient
16   of Travis Park property other than what's in the
17   ordinance -- the document you're referring to as an
18   ordinance -- at the time or before the time that it was
19   passed?
20        A    The only thing that I know that was given
21   directly to them as an official piece of paper would have
22   been that ordinance.  Other than that, there's proof just
23   through these conversations that they were deferring to
24   the UDC as to what happened with that land, but that
25   wasn't something that was handed in writing to the UDC.

1  Q   Okay. And what do you contend was handed in
2  writing to whoever received it, whether it was Bee or
3  UDC?
4  A   The 1899 ordinance.
5  Q   And who handed it to them?
6  A   I have no idea.
7  Q   Well, let me ask you these questions, then. Are
8  you aware of any instrument that created the right that
9  you've described to possessory interest in land in Travis
10 Park that was signed by the city?
11 A   Other than the ordinance?
12 Q   Yes. The ordinance. The thing you're referring
13 to, an ordinance.
14 A   I don't know of anything else.
15 Q   Do you know whether that was signed by the City?
16 A   I would assume they would have had to have
17 signed it, but I haven't seen it.
18 Q   Okay. Does the chapter have a copy of any
19 document signed by the City that conveys a possessory
20 interest in Travis Park?
21 A   All I have is the documentation that I showed
22 you that the City was giving permission to the UDC in
23 1899.
24 Q   Okay. So when the City -- what I'm asking is:
25 Does the chapter know whether when the City gave that --

1   A   Uh-huh.

2   Q   I want to know if you have an understanding of
3   what that chapter, Barnard E. Bee, believed it was
4   receiving from the City back in 1899 at the time they
5   took the property or -- the Travis Park property?

6   A   I would say it remained the same because there's
7   a lot of verbal from -- I mean, from 1899 until 1976, you
8   had members who were members, I think, for a very long
9   time, and they would talk about -- and we still have
10  members now that remember -- she calls them the old
11  timers -- talking about how they own the monument from
12  way back when and I think that that oral history just was
13  passed down.  So I would feel comfortable that how they
14  represented it and felt in 1976 would be similar to how
15  they were thinking in 1899.

16  Q   And just for the purpose of a clean record, let
17  me ask the question again, but specifically with respect
18  to the possessory interest in land in Travis Park.

19  A   Right.

20  Q   And the question is:  Do you have an
21  understanding of what the Bee chapter believed back in
22  1899 it was receiving from the City with respect to that
23  real property interest?

24  A   Use of the land for the monument to be placed
25  there and to remain there.

1  about what the ASJ chapter owns or has a right to, were
2  you basing your answers on your understanding, not
3  necessarily a legal understanding?
4     A   Yes.  As best I could try to answer the
5  questions.
6     Q   In fact, Mr. Fitzpatrick mentioned recording and
7  property records.  Have you ever gone to property records
8  in Bexar County or any other county to file something?
9     A   No.  I don't recall ever doing anything like
10 that.
11    Q   If tomorrow you had to go file some written
12 piece of paper with property records in Bexar County,
13 would you know how to do that?
14    A   No.
15    Q   And summer of 2017, did you have communications
16 with the City of San Antonio about the Travis Park
17 memorial?
18    A   I attempted to.
19    Q   Did you --
20    A   I sent emails and I tried making phone calls and
21 I went to city council.  Yes, I attempted.  I
22 communicated with them as best I could in my attempts.
23    Q   Did you communicate to anyone working for the
24 City of San Antonio that you believe your chapter owned
25 the Travis Park memorial?

1   A   Yes.

2   Q   Who was that communication with?

3   A   Jackie Salvador.

4   Q   Did you communicate with Ms. Salvador, or anybody else, your belief that the chapter had some right to use of the land in Travis Park?

7   A   Yes.

8   Q   Was that with Ms. Salvador or anybody else?

9   A   Ms. Salvador, and I also explained to Mayor Nirenberg's secretary, Alice, that there was an issue with the land and that it was very important that I speak with Mayor Nirenberg before they had that vote, and so -- but I was unable to speak with him.

14  Q   And that was with the mayor's secretary?

15  A   Yes.

16  Q   Did she ask follow-up questions about how you guys -- how it is that you guys think you own something?

18  A   She asked me to fill out a piece of paper and I was so nervous I couldn't even write. And I told her I really didn't want to put anything in writing because what we needed was a conversation face to face because if you write something down, people will put in their -- you know, it's better to have the discussion than to write something and leave it for someone just to -- I didn't say all that to her, but that was why. So I did put a

1  request -- I filled out a piece of paper that requested
2  to meet with the mayor and no one has ever called me.
3      Q   So did she ever ask you how it is that you guys
4  think you own the memorial?
5      A   No.  We didn't have a discussion about that.
6  She knew that there was -- I mean, I did tell her that I
7  was there to talk to him about Travis Park and the land
8  and that it was...
9      Q   Did she ever say, Please show me whatever
10 paperwork you have --
11     A   No.
12     Q   -- regarding the memorial?
13     A   No.
14     Q   Did she show any interest in how you guys might
15 own the memorial?
16     A   No.
17         MR. CRANE:  I have no other questions until
18 trial.  Thank you.
19         MR. FITZPATRICK:  I think I have some
20 follow-up based on that.
21                      **EXAMINATION**
22 BY MR. FITZPATRICK:
23     Q   So when I asked you what the chapter's -- when I
24 asked you to describe the interest that the chapter was
25 claiming in Travis Park property, you explained that to

1 you closed on the house?
2   A   Whatever was supposed to happen, happened.
3   Q   So if you were interested in filing a deed or
4 some type of indication of ownership, would you know how
5 to go about asking someone to find out how to do it?
6   A   I could figure it out, but I wouldn't be able to
7 go directly to do it.  I don't know who I would ask
8 first.
9   Q   So this conversation that you had with Alice.
10  A   Yes.
11  Q   When -- what was the date of that?
12  A   It was -- I think it was a couple of days before
13 the city council vote.  It was definitely the week of
14 that vote because I had been trying to call and I had
15 been sending emails and no one was responding.  And so I
16 finally, because it was getting so close, just went down
17 to city hall to see if I could talk to somebody and Alice
18 was the only one that I was able to speak with --
19  Q   Did you --
20  A   -- and.
21  Q   Go ahead.
22  A   I explained to her the importance of speaking
23 with the mayor because we had concerns about the property
24 in Travis Park.  And I did not have a detailed
25 conversation with her.  She asked me to fill out a form

1  of what the issues were, and I told her it was -- I just
2  needed to talk to the mayor. I didn't want to put
3  anything in writing. I wanted to discuss it with him.
4      Q    So the meeting was on Thursday, the 31st of
5  August, correct?
6      A    Do you mean when they voted?
7      Q    Yes.
8      A    Yes. So it was maybe a couple of days prior to
9  that.
10     Q    So it was sometime Monday, Tuesday or Wednesday
11 or Thursday?
12     A    It was probably Monday or Tuesday because after
13 that -- well, she went back behind closed doors and came
14 back and said, He's not going to be able to meet with
15 you. The best I can do is maybe his policy adviser can
16 call you. So she did call and I told her we had concerns
17 and she said, Go to city council. So -- the city council
18 hearing. So I know it was before that.
19     Q    Did you tell her anything more specific than, We
20 have concerns about the property?
21     A    I think I mentioned to her that we didn't know
22 even who owned the land. I mean, where was the deed, but
23 I didn't get into anything else with her. I just wanted
24 her to realize that there were questions that needed to
25 be answered and we needed to talk about it.

```
 1      Q    You did not tell her that you thought your
 2 chapter owned the Travis Park land, correct?
 3      A    No.  Right.
 4      Q    You didn't tell her that you thought your
 5 chapter had a right to use the Travis Park land forever,
 6 correct?
 7      A    I did not have that sort of conversation.  She's
 8 not the decision-maker.  What I was trying to show her
 9 was that it was very important that I speak with the
10 mayor before he had that vote.
11      Q    Okay.  You indicated a conversation with
12 Ms. Salvador in response to your -- your lawyer's
13 questioning.  Do you recall giving that answer just a
14 minute ago?
15      A    That I gave her -- yes.  I gave her information
16 regarding the ordinance.
17      Q    Did you ever tell Ms. Salvador that your chapter
18 claimed to have a right to use the land in the middle of
19 Travis Park forever?
20      A    I don't remember.  I think so.  It was all
21 through emails, so it would be in an email.
22      Q    So anything you told Ms. Salvador would be in
23 the emails?
24      A    Yes.
25      Q    Okay.  And those emails have been exchanged by
```