UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ALBERT SIDNEY JOHNSTON Chapter No. 2060, United Daughters of the Confederacy, ROBIN TERRAZAS, President, JEAN CAROL LANE, First Vice-President | § § § | CIVIL ACTION NO. SA-17-CV-1072-DAE |
| v. | § | |
| THE CITY OF SAN ANTONIO | § | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
RE OWNERSHIP OF THE TRAVIS PARK MEMORIAL**

Plaintiff, The Albert Sidney Johnston Chapter No. 2060, submits this its Motion for

Partial Summary Judgment Regarding Ownership of the Travis Park Memorial, and shows as

follows:

Table of Contents

Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fact Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument on the Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

      1.The City of San Antonio gave the use of the land in Travis Park to the "Daughters
      of the Confederacy" for the use of the monument .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

      2. The Barnard E. Bee Chapter transferred its interests in the Travis Park monument
      and the cemetery to the Albert Sidney Johnston chapter No. 2060 in 1972 . . . . . . . . . .8

      3. The March 27. 1899 grant constituted an express easement . . . . . . . . . . . . . . . . . . . ..10

      4. If the March 27, 1899 ordinance did not constitute an express easement, it did
      constitute an implied easement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . ..13

      5. The licensor cannot revoke the license if the licensee expends money and labor in
      reliance on the license . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

      6. The Travis Park monument was not a "fixture" . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

      Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

Exhibits

| Exhibits | Description |
|---|---|
| A | Robin Terrazas Affidavit |
| | • Jan. 13, 1972 Johnston Chapter Minutes |
| | • Jan. 20, 1972 Minutes |
| | • Copy of Dec. 13, 1953 Certified Copy of Ordinance |
| | • March 25, 1975 Deed |
| | • 1972 UDC Book |
| | • Feb. 13, 2018 Eva Long Letter |
| B | Rita Schimpff Affidavit |
| | • Feb. 25 and 26, 1900 San Antonio *Light* |
| | • 1035-1936 San Antonio *Light* |
| | • April 23, 1936 San Antonio *Light* |
| | • June 28, 1942 San Antonio *Light* |
| | • Nov. 5, 1953 San Antonio Express |
| | • March 27, 1899 Ordinance, photos by Schimpff |
| | • March 27, 1899 Ordinance, photos by the City |
| | • Jan. 12, 1903 City Minutes |
| C | Melinda Uriegas Deposition Excerpts |
| D | Discovery Documents |
| E | Robin Terrazas Deposition Excerpts |
| F | Robert Schlitzberger Report |
| G | Eva Long Affidavit |

*Law*

1. Summary judgment shall be rendered if the pleadings and evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.Pro. Rule 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrates the absence of genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The party opposing a motion must present affirmative evidence, in order to defeat a properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

2. All of the evidence and inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion for summary judgment. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The judge's function is not to weigh the evidence or determine credibility. *Anderson, supra*, 477 U.S. at 249, 106 S.Ct. at 2511.

*Fact Summary*

1. The Barnard E. Bee chapter of the Daughters of the Confederacy raised the funds for the Travis Park memorial. The Bee chapter claimed ownership of the memorial. Ex. C, San Antonio *Express-News*, Aug. 21, 2017, p. 3. Quoting Theresa Gold, a former president of the Albert Sidney Johnston Chapter No. 2060, Paula Allen, the *Express News* historian, explained that the ASJ chapter claimed ownership of the statue in 1999. *Id*. The Bee chapter was part of the Daughters of the Confederacy, later named the United Daughters of the Confederacy. *Id*. The ASJ chapter succeeded to the interests of the Bee chapter in regard to

the Travis Park memorial. *Id.* Plaintiff asks the Court to take judicial notice of the newspaper article written by Paula Allena and dated Aug. 21, 2017.

2. The Bee chapter asked the City of San Antonio for permission to erect the monument in the center of Travis Park. On March 27, 1899, the San Antonio Board of Aldermen approved that request to use land in the center of the park. Ex. B, R. Schimpff Affid., p. 3. The ordinance was adopted unanimously. *Id.* The Board of Aldermen approved four ordinances at that meeting. The minute book records each meeting. The minutes note specifically any ordinances which were passed during each meeting. But, only one of those four ordinances was also recorded in the Ordinance Book.

3. On June 3, 1899, the City of San Antonio and the Bee chapter dedicated the cornerstone for the Travis Park memorial. Ex. C, San Antonio *Express-News*, Aug. 21, 2017, p. 1. The memorial itself was then erected in the center of Travis Park on April 28, 1900.

4. As the years passed, the Bee chapter continued to claim ownership of the Travis Park memorial. In 1900, the City was offered $50,000 by Andrew Carnegie to build a library. Mr. Carnegie donated millions of dollars around the country for libraries and other civic causes. Some citizens of San Antonio suggested Travis Park for the new library. But, building a library in Travis Park would require moving the Confederate memorial away from the center of the park. Alderman Surkey insisted the City would need permission from the Daughters of the Confederacy before the memorial could be moved. Ex. B, R. Schimpff Affid., p. 1.

5. In a newspaper article dated 1935-1936, the City was preparing for the Texas Centennial celebration. Some persons suggested erecting monuments to Texas heroes in

2

Travis Park. The proposed plan would place Texas hero monuments in three corners of the park and Confederate memorial in the fourth corner of the park. According to the San Antonio *Light*, a Miss Bessie Houston, daughter of Mrs. A.W. Houston - president of the Bee chapter when the Travis Park memorial was erected - said the Daughters had the right to use the center of Travis park for the memorial. Ex. B, R. Schimpff Affid., p. 2.

6. In an April 23, 1936 article, a member of the local advisory group for the Texas Centennial said the City would have to gain the permission of the Daughters of the Confederacy before the Travis Park memorial could be moved. Ex. B, R. Schimpff Affid., p. 2.

7. In 1942, a "Miss Elizabeth Houston, "apparently Bessie, said that the United Daughters of the Confederacy owned the Confederate memorial in Travis Park. Ex. B, R. Schimpff Affid., p. 2. The San Antonio *Light* news report included no contradiction to her claim. As the article stated, "Travis park may belong to the city, but its heart belongs to the U.D.C." See Exhibit 4, June 23, 1942 article, to Ms. Schimpff's affidavit. The "heart" of Travis Park likely referred to the center of Travis Park, where the statue was located. The same article was produced by the City of San Antonio as COSA 000076. See Exhibit D, Discovery Documents.

8. In the 1950's, the City of San Antonio considered a project to  build an underground parking garage in Travis Park. The Maverick family field suit regarding ownership of the park. Samuel Maverick had given the land to the City in the 1880's. The Maverick family sought the return of the land if the City would no longer use it as a park. That lawsuit resulted in the decision in *Green v. City of San Antonio*, 282 S.W. 2d 769 (Tex.

App. San Antonio 1955). The lease between Zachry and the City resulted in the decision in

*Zachry v. City of San Antonio*, 305 S.W. 2d 558 (Tex. 1957). In a Nov. 5, 1953 article,

Charles M. Dickson, an attorney who represented opponents of the garage, said the City did

not own the land in Travis Park. He said the Daughters owned the Confederate memorial.

The attorney warned that removing or taking the memorial would constitute theft. Ex. B, R.

Schimpff Affid., p. 2-3. Mr. Dickson made his public comments just three weeks after the

City entered into a lease agreement with Zachry for the use of an underground garage at

Travis Park. *Zachry v. City of San Antonio*, 296 S.W. 2d 299, 301 (Tex. App. San Antonio

1956). The copy of the ordinance received by Robin Terrazas was then dated two months

after Mr. Dickson's comments.

9. Theresa Gold gave a copy of the 1899 ordinance to Robin Terrazas. Ms. Gold was

president of the ASJ chapter through the 1990's. Ex. A, R. Terrazas Affid., p. 2. Ms. Terrazas

believes this is the same copy presented to the ASJ chapter in 1972 by Mrs. Oldom. *Id*. Mrs.

Oldom was the last president of the Bee chapter. President Oldom attended a meeting of the

ASJ chapter in 1972. She talked about the attempt by H.B. Zachry Co. to build an

underground parking garage in Travis Park years earlier. The Daughters protested, explained

Mrs. Oldom. She gave the ASJ chapter a copy of the ordinance for "safe keeping if

something should arise in the future." Ex. A, R. Terrazas Affid., p. 2. Mrs. Terrazas believes

the ASJ chapter entered into a verbal agreement with the Bee chapter to take care of the

Confederate memorial. *Id*.

10. The March 27, 1899 ordinance received by Ms. Terrazas contains a certification

at the bottom the page. The original copy is on legal size paper, as was often used in the

4

1950's. The certification format appears to be similar to that used by the City of San Antonio in the past. Ex. C, M. Uriegas Depo, p. 21/ l.3-6. Ms. Uriegas is the head of the Municipal Archives department at the City. The copy of the ordinance received by President Terrazas states:

> "Petition of the Daughters of the Confederacy for permission to erect a monument in Travis Park. In this connection Ald. Rheiner introduced the following ordinance:
>
> "Be it ordained by the City Council of the City of San Antonio that permission be and is hereby granted to the Daughters of the Confederacy to use the amount of land petitioned for in the center of said Travis Park and that the City Engineer be hereby ordered to survey and define said plat of land at once.
>
> The ordinance was adopted unanimously."

11. While researching at the City of San Antonio Municipal Archives, Rita Schimpff found the March 27, 1899 ordinance in the City minute books. The copy she found is identical to the copy which was later produced by the City during the discovery process. See Ex. B, R. Schimpff Affid., p. 3. The language of the copy found by Ms. Schimpff and as later produced by the City is identical to the copy received by Ms. Terrazas from Ms. Gold.

12. But, the copy received by Ms. Terrazas includes some information not found in the Minute book. Page 757 of Journal Book "M" does not convey information regarding who voted for the ordinance. Ms. Terrazas' copy includes the name of the Aldermen who voted for the ordinance: Alexander, Barker, Davis, Lamm, Mahncke, Mumme, O'Connor, Piper, Rheiner, Richter, Surkey, and Thiele. Ex. A, R. Terrazas Affid., Ex. 3. It also contains a signature for the Mayor and states that the ordinance was approved. It includes the name of

5

W.W. Johnson, City Clerk. According to the City's website, W.W. Johnson was the City

Clerk from 1899 to 1901. See: https://www.sanantonio.gov/Municipal-Archives-

Records/About-Archives-Records/City-Clerks (accessed Oct. 16, 2018).

    13. The March 27, 1899 ordinance does not appear in the City's ordinance book. The

March 27, 1899 ordinance should appear in the Ordinance book which is marked "1895-

1900." Ex. B. R. Schimpff Affid., p. 4. But, it does not appear in that book. Ms. Uriegas

could not explain its absence. She simply suggested that if it does not appear in the ordinance

book, then it was not an ordinance. Ex. C, M. Uriegas, p. 23-24. She did in the end conclude

that she could not explain why an ordinance appears in the minute book, but not in the

ordinance book. Ex. C, M. Uriegas Depo, p. 24/ l.9-12.

    14. Ms. Schimpff returned to the Municipal Archives in September, 2018. She

noticed that at the March 27, 1899 meeting, the Board of Alderman approved four ordinances

in total. But, only one of those ordinances was included in the ordinance book marked 1895-

1900. She looked at the prior meeting, which occurred on March 20, 1899. The March 20,

1899 meeting approved six ordinances. Of those six ordinances, only five were entered into

the ordinance book. Ex. B, R. Schimpff Affid., p. 4-5. Some approved ordinances do not find

their way into the ordinance book.

    15. The state headquarters for the United Daughters of the Confederacy agrees that

the Bee chapter legitimately transferred its interests in the Confederate memorial to the

Johnston chapter. The Bee chapter also transferred its interest in the Confederate cemetery on

the east side of San Antonio to the Johnston chapter. Ex. A, R. Terrazas Affid., p. 3-4; Ex. G,

E. Long Affid., P. 1. Eva Long, former President of the Texas Division, the higher

6

headquarters, testified that the 1972 transfer from the Bee chapter to the ASJ chapter satisfied the UDC requirements.

*Argument*

1. The City of San Antonio gave the use of the land requested in Travis Park to the "Daughters of the Confederacy."

In 1899, the City gave the use of the land in the center of Travis Park to the "Daughters of the Confederacy." Fact Summary, para. 10. As mentioned above, Robin Terrazas received a copy of a certified copy of the Ordinance from a prior President, Theresa Gold. Fact Summary, para. 9. Rita Schimpff saw the hand-written ordinance in the San Antonio archives. Attached to Ms. Schimpff's statement is the hand-written copy of the same Ordinance, both the one she saw in the book and the same ordinance produced by the City. The use of the land beneath the monument was given to the "Daughters of the Confederacy."

The language in both versions is identical. The information provided by the members of the ASJ chapter about the monument has value. Fed.R.Civ.Pro. Rule 803(20) allows hearsay if that hearsay concerns reputation in the community for general history regarding important events which arise before the controversy. "It is considered unlikely that a falsehood could become generally accepted as truth in the community, where the matter is of importance to the community." *Blackburn v. United Parcel Service, Inc.*, 179 F.3d 81, 100 (3d Cr. 1999) (Quoting Saltzburg, *Federal Rules of Evidence Manual*, at 1699) (Discussing Rule 803(20) as an analogy to Rule 803(19); *Pan Am World Airways, Inc. v. Aetna Casualty & Surety Co.*, 368 F.Supp. 1098, 1104 n.5 (S.D. N.Y. 1973) (Noting that reputation is acceptable as proof of historical events even though it might be considered hearsay). The reputation must represent a consensus in the community and not simply represent an

7

opinion of one or a few constituents. *Blackburn id.* When a matter has been sufficiently

discussed within a well-defined community, so that its truth has obtained "circumstantial

guarantees of trustworthiness," then it is properly the subject of reputation testimony.

*Blackburn, id.*

The Travis Park memorial has value to the members of the ASJ chapter and to San

Antonio in general. Statements from 1900 through 1999 reflect the belief that the

Confederate memorial belonged to the Daughters of the Confederacy. See Fact para. 4-9

*supra.* The members of the ASJ chapter have believed for decades that they had some right to

use the land beneath the monument. In 1953, H.B. Zachry Co. sought to build a parking

garage beneath Travis Park. Ex. A, R. Terrazas Affid., p. 2. Twenty years later in 1972, Mrs.

Oldom was still concerned about that incident. Ex. A, R. Terrazas Affid., p. 2.  The

presidents of the chapter have passed the certified copy of the Ordinance from one president

to another until it now rests with the current President, Robin Terrazas. That reputation for

ownership or right to use the land is pertinent.

## 2. The Barnard E. Bee Chapter transferred its interests in the Travis Park monument and the cemetery to the Albert Sidney Johnston chapter No. 2060 in 1972.

The Bee chapter transferred its interests in the monument and in the Confederate

cemetery on the east side of San Antonio cemetery to the ASJ chapter. See Fact para. 15

*supra.* Ms. Long, former President of the Texas UDC, testified that the handover amounted

to a transfer of ownership from the Bee chapter to the ASJ chapter under the rules of the

UDC organization. Ex. G, E. Long Affid., p. 1. Texas courts will not interfere with the

internal management of voluntary associations. *Dickey v. Club Corp. of Ame.,* 12 S.W.3d

172, 176 (Tex.App. Dallas 2000) (Finding that country club rules regarding tee times was not properly a matter for court, even though those rules meant a married couple could not play golf together); *Harden v. Colonial Country Club*, 634 S.W.2d 56, 58 (Tex.App. Ft. Worth 1982) (Affirming summary judgment against a club member who tried to sell his membership to a third person in contravention of the club rules).

Courts will not interfere with the internal management of voluntary associations so long as the governing bodies of those associations do not substitute legislation for interpretation and do not overstep the bounds of reason or violate public policy or the laws of the state. *Dickey, supra.*; *Dallas County Medical Soc. v. Ubinas-Brache*, 66 S.W.3d 31, 41 (Tex.App. Dallas 2001). Judicial review is proper only when the actions of the organization are illegal, against some public policy, or are arbitrary or capricious. *Ubinas-Brache, id,* (finding that a suit based on breach of contract regarding membership is not cognizable). In *Harden, supra,* the plaintiff tried to argue that the Club's policy was not reasonable, or at least the policy regarding transfer fees was a question of fact. But, the court ruled that in regard to private, non-profit associations, the association should manage affairs without interference from the courts, so long as their conduct is not unlawful. *Harden,* 634 S.W. 2d at 59. The Bee chapter transferred its interests to the Johnston chapter in accordance with UDC rules in 1972. Ex. G, E. Long Affid., p. 1. The ASJ chapter is a non-profit entity. As part of the Texas Division of the United Daughters of the Confederacy, the ASJ chapter is a 501(c)(3) organization, able to accept donations. The chapter is entitled to deference regarding how it transfers property from one chapter to another.

9

3. The March 27, 1899 grant constituted an express easement.

        Among the different ways an easement may be created is by express grant. 31A Tex.Jur. 3d, "Easements and Licenses in Real Property," §20. As an express grant, the description of the easement must be definite and certain, such that a surveyor could go upon the land and locate the easement from the description. *Id.* An easement can only be acquired by a grant in one of three ways: 1) express grant, as by a deed; 2) by implied grant, as a way of necessity; and, 3) by prescription or limitation, which presumes a grant. *Williams v. Kuykendall*, 151 S.W. 629 (Tx. App. Austin 1912). In this case, the City of San Antonio expressed an intention to execute a deed, but did not issue the deed. This situation is rare, but it has occurred. The courts which have addressed similar situations have held that an ordinance has binding effect, even if the content of the ordinance did not find its way into the deed. *See Guevara v. Guevara*, 280 S.W. 736 (Comm'n App. 1926) (Where a deed recited the note, and the note referred to the ordinance, subsequent grantees had constructive knowledge of the ordinance); *Pasadena Police Officers Ass'n v. City of Pasadena*, 497 S.W.2d 388, 393-394 (Tex. App. Hou. 1973) (A reverter clause in the ordinance was binding on the Police Officers association, even though it had been omitted from the deed. The court noted that the ordinance had been posted on the agenda and copies of the ordinance were available to the public).

        A city has the power to grant or create an easement across municipal property. *City of Aransas Pass v. Minter*, 21 S.W.2d 384 (Tex. App. San Antonio 1929) (A municipality in its contracts and dealings should be "bound, governed, and controlled" by the same laws and rules of procedure as those which govern and control persons, and, therefore, finding that the

City was estopped from violating an agreed upon easement).

When an express easement exists, the courts look to the language of the easement to determine the rights of access granted. *Holstrom v. Lee*, 26 S.W.3d 526 (Tex. App. Austin 2000). As with any writing, construction of an unambiguous writing granting an easement is a question of law. *Bradshaw v. Lower Colorado River Authority*, 573 S.W. 2d 880. 883 (Tex. App. Beaumont 1978). The courts will generally give effect to the parties' intention as expressed by the writing because the objective intent of the parties controls. *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968). Generally, any language that clearly shows an intention to grant an easement is sufficient for the purpose of granting an easement; no special form or particular words need be employed. *Hubert v. Davis*, 170 S.W.3d 706, 711 (Tex. App. Tyler 2005) (even though not using the word "easement, a grant of a right of access amounted to an easement). Where the writing is ambiguous, construction of the grant is subject to interpretation, and any ambiguity must be resolved in favor of the grantee and against the grantor. *El Paso Land Imp. Co. v. Crawford*, 292 S.W. 518 (Tex. Comm'n App. 1927); *Houston Pipe Line Co. v. Dwyer*, 374 S.W. 2d 662, 665 (Tex. 1964). The intention of the parties is of primary importance. In arriving at this intention, all provisions of the instrument will be considered and given effect if possible from a fair construction of the entire instrument, considering the effect of the various paragraphs on each other. *Kearny & Son v. Fancher*, 401 S.W. 2d 897, 903 (Tex. App. Ft. Worth 1966).

Construing the evidence in favor of the City, the evidence indicates the parties intended the memorial to be erected on land controlled by the Daughters. The "use" of the

11

land in the center of Travis Park was given to the Daughters for the memorial. Because the memorial was made from some 42 tons of granite, it is unlikely the parties had any intention that the permission was for erection only. It would require substantial money and labor to "un-erect" the statue. This was not intended to be a temporary memorial.

Texas cities exercise their statutory and constitutional powers generally through the legislative process of adopting municipal laws. Those municipal laws have as much enforceability in court as a state statute. These municipal laws are referred to as ordinances. The general ordinance making authorization today is contained in the Local Government Code as amended in 1985 to be applicable to any city "however incorporated." Local Govt. C. §51.001, *et seq*. Historically, the statutory ordinance-making authority of Texas cities was derived from the two general Acts of the nineteenth century providing for the incorporation of cities, in 1858 and 1875, as well as the legislation in 1913 implementing the home rule amendment.

In 1899, the general statutes of 1858 and of 1875 would have applied. 22 Tex.Prac., Municipal Law, §3.15 (2d ed.). The 1875 Statute provided:

> All ordinances and resolutions adopted by the council shall, before they take effect, be placed in the office of city secretary; and if the mayor approves thereof, he shall sign the same, and such as he shall not sign, he shall return to the city council, with his objections thereto; upon the return of any ordinance or resolution by the mayor, the vote by which the same was passed shall be reconsidered, and if, after such reconsideration, a majority of the whole number of aldermen agree to pass the same, and enter their votes on the journal of their proceedings, it shall be in force; and if the mayor shall neglect to approve, or object to any such proceedings, for a longer period than three days after the same shall be placed in the secretary's office as aforesaid, the same shall go into effect.

Session Laws—Acts 1875, 14th Leg., 2nd C.S., pp. 113, 132 to 33, ch. 100, § 17.

12

*Pacific RR. Co.*, 350 S.W. 3d 640 (Tex. App. Hou. 2011). To constitute an implied easement, the use of the easement must be apparent, permanent in existence at the time of the grant, continuously used, and reasonably necessary to the enjoyment of the premises granted. 31A Tex. Jur., "Easements and Licenses in Real Property," §26.

The Daughters have continuously used the memorial. The Johnston chapter conducted a re-dedication of the memorial in 1999. At the re-dedication, the president at the time, Theresa Gold, said the chapter had the right to use that land in perpetuity. Ex. E, R. Terrazas Depo, p. 20. The Daughters themselves or prominent persons in the San Antonio community have asserted UDC ownership of the memorial from 1900 to 1999. See Fact para. 4-9 *supra*. The memorial remained in place until it was forcibly removed by the City in 2017. The Daughters' claim to own the memorial and to have a right to use of the property in Travis Park has been apparent. In June and September, 2017, the current president of the Johnston chapter re-affirmed to the City the UDC claim to ownership of the memorial and to use of the land beneath the memorial. Ex. E, R. Terrazas Depo, pp. 37-38 and Ex. T3. As Ms. Terrazas stated in her Sept. 5, 2017 email to Mayor Nirenberg, "At no time was the monument given to the city . . ." Ex. E, R. Terrazas Depo, Ex. T3 (last page). The easement is necessary to the enjoyment of the memorial. Without the easement, the memorial would likely become the property of the City. Under the law of fixtures, it might indeed become a permanent part of Travis Park. Where a common owner originally owned both the dominant and the servient estates, the determination of whether an easement vested in favor of the transferee of the dominant estate depends on the situation existing at the time of the conveyances. *Hoak v. Ferguson*, 225 S.W. 2d 258, 260 (Tex. App. Ft. Worth 1953). That is

14

The March 27, 1899 ordinance was placed with City Secretary when it was entered into the minute book. It was "adopted unanimously."

The 1875 statute also established the form of an ordinance still used today: "Be it ordained by the city council of the city of _____." Act of 1875, § 140. And, that is how the March 27, 1899 ordinance is phrased. Fact para. 10 *supra*. The March 27, 1899 ordinance was binding on the City of San Antonio. It granted an easement to the "Daughters of the Confederacy" for the use of the memorial. Defendant has suggested that the permission to erect the memorial applied only to its erection. But, that contention is not sensible. It would not have effected the purpose of the ordinance to erect the memorial and then take it down. To "erect" a 42 ton statute is to leave it in place. Indeed, today, the Confederate memorial has been removed and we have seen that damage was caused to the rifle in three places. The cost of removal to date amounts to $250,000 in 2018 dollars. It is no small thing to un-erect a 42 ton memorial. The memorial was not intended to be temporary. There is no evidence to suggest otherwise.

4. If the March 27, 1899 ordinance did not constitute an express easement, it did constitute an implied easement.

Even if there was not an express grant of an easement, there has been an implied easement. When there is no written grant of an easement, an easement can nevertheless be established when the circumstances surrounding an owner's conveyance of part of a previously unified tract of land may cause an easement to arise between the two new parcels. An implied easement may arise in favor of the parcel granted, which is an implied grant, or in favor of the parcel retained by the grantor, which is an implied reservation. *Seber v. Union*

13

whether an easement existed in favor of the Daughters of the Confederacy depends on the situation existing at the time of the ordinance.

The City granted the "use" of the center of Travis Park to the Daughters in 1899. Just a year later, the City considered moving the memorial, so a library could be built in the middle of Travis Park. A 1900 news report quotes Alderman Surkey saying the City would need permission from the Daughters before they could move the memorial. Fact para. 4 *supra*. Alderman Surkey was one of the Alderman who voted for the March 27, 1899 ordinance. He was in a position to express the intent of the Board of Aldermen. There was no dissent to his opinion in the 1900 news report. And, 40 years later, Bessie Houston, daughter of Mrs. A.W. Houston, said the memorial belonged to the Daughters. See Fact para. 7. As before, the news report included no disagreement. Indeed, the news report preceded her assertion with an aphorism: "Travis park may belong to the city, but its heart belongs to the U.D.C." Ex. B, R. Schimpff Affid., 1942 San Antonio *Light* news report. Looking at the intent of the parties at the time the March 27, 1899 ordinance was approved, both parties understood the Daughters were given use of the land for the memorial. There was no time limit regarding that use. There is no evidence indicating otherwise. That grant amounted to an easement. It also likely constituted an irrevocable license.

5. The licensor cannot revoke the license if the licensee expends money and labor in reliance on the license.

The March 27, 1899 ordinance conveyed an interest to the "Daughters of the Confederacy." The ordinance did not name the Bee chapter. It named the "Daughters of the Confederacy." Ms. Uriegas argued that if the ordinance did not appear in the Ordinance

15

book, then it does not exist. But, the copy of the ordinance received by Ms. Terrazas is dated
Dec. 10,1953. As of that day, a City clerk named Starbeck believed the March 27, 1899
ordinance did in fact exist. Mr. Starbeck even added information not contained within the
hand-written version in Journal Book "M." Mr. Starbeck added information indicating who
voted for the ordinance and the act that it had been approved by the mayor.

     In its third Motion to Dismiss (Dkt #44), the Defendant claimed the City revoked the
license, if there was one, on Aug. 31, 2017. Def's 3rd Mtn Dismiss, p. 10. It was on Aug. 31,
2017 that the City Council voted to remove the Travis Park memorial. Defendant claimed the
ordinance which removed the monument also revoked the license. But, it does not explain in
what way the license was revocable. What term or condition in the original grant made it
revocable? Nothing in the March 27, 1899 indicates any degree of revocability. Indeed, Ord.
17-4900 makes no reference to a license or easement. It makes no reference to the Daughters
of the Confederacy, at all. See Ex D, Discovery Documents, Ord. 2017-08-31-0598 (formerly
Ord. 17-4900). If the 2017 ordinance revoked the 1899 ordinance and license, then it did so
in silence.

     A license without consideration may be revoked at the will of the licensor. *Arant v.
Jaffe*, 436 S.W.2d 169, 178 (Tex. App. Dallas 1968); *City of Austin v. Puett*, 344 S.W.2d
717, 720 (Tex. App. Austin 1961) (The general rule is that gratuitous licenses are revocable
at the will of the grantor. One exception to this rule is where the licensee expends a
considerable amount of money or labor in reliance on the subsistence of the license).

     The license or easement was granted for the "use" of the monument. As long as the
center of Travis Park was used for the purpose of the memorial, the license cannot be

revoked. Revocation will be denied where a licensee has expended considerable funds or labor in reliance on the existence of the license. Tex. Jur. "Easements and Licenses in Real Property" §95. *See Markley v. Christen*, 226 S.W. 150, 153 (Tex. App. San Antonio 1920) (Where the apparent licensee erected improvements to land on which it claimed an easement or license, the licensor cannot then revoke the license); *Joseph v. Sheriff's Association*, 430 S.W.2d 700, 704 (Tex. App. Austin 1968) (Licenses are generally revocable at the will of the licensor, however, when expenditures have been made in reliance on the license revocation should be allowed only in a fair and equitable manner). The Daughters erected a monument in the center of Travis Park, in reliance on the March 27, 1899 ordinance. The City cannot now revoke that license or permission, so long as the monument remained in place. Robert Schlitzberger, of Schlitzberger and Daughters in Houston, estimated the replacement cost for the Travis Park memorial to amount to $338,567. He also estimated that some 42 tons of granite were used in its creation. See Ex. F. R. Schlitzberger Report. This was never intended to be a temporary memorial.

6. The Travis Park monument was not a "fixture."

The City has also argued that the Travis Park monument became the property of the City as a "fixture" on land in Travis Park. Def's 3rd Mtn Dismiss (Dkt #44), p. 11. The City previously advanced this defense in its Response (Dkt #27) to Plaintiffs' Motion to Amend. To reach the conclusion that the monument was a fixture, the fact-finder must first find that the City did not grant an easement or license to the "Daughters of the Confederacy." The memorial cannot be a fixture on land if that land was legally controlled by the Daughters as an easement or license.

17

Even if the Daughters did *not* control the land in the center of Travis Park, whether an improvement has become a fixture depends on the intent of the builder, not the owner of the dominant land estate. Texas courts employ a test to determine whether a fixture was intended to become part of the realty that primarily looks to the intent of the party who installs the improvement. *Trenolone v. Cook Exploration Co.*, 166 S.W.3d 495, 499 (Tex.App. Texarkana 2005), *quoting Logan v. Mullis*, 686 S.W.2d 605, 607 (Tex. 1985). The third criteria of intent is the preeminent factor, while the first two criteria constitute evidence of that intent. *Logan, supra*, at 608. In *Trenolone*, Cook Exploration had mineral rights to a parcel of land. An abandoned pipeline beneath a nearby housing development became the point of contention. Cook claimed the pipeline as abandoned personal property and claimed an easement to use that pipeline. The homeowners argued the pipeline became part of the real property and, therefore, transferred to them when they bought their homes. The court looked at the intent of the original installer and found the installer acquired an easement for purposes of construction, maintenance and repair. *Trenolone*, at 499. The court reversed the award of summary judgment.

The intent of the builder of a fixture is a question of fact. *Logan, supra*, at 608. The Daughters, rightly or wrongly, believed in 1899 that they were erecting a monument on land which they controlled. The City has no evidence to suggest otherwise. *See, also, Logan v. Mullis*, 686 S.W.2d 605, 608 (Tex. 1985) (looking at the conduct of the installer of a tank car which was used a drain culvert. The court concluded the installer intended the tank car to become part of the real property, noting that the installer went to a great deal of trouble to protect the tank car from erosion, packing it with clay or gravel, building a retaining wall and

18

then laying a gravel road on top of the culvert and tank car).

In this matter, the installers were the Bee chapter. It is their intent that pertains. The Defendant has no evidence regarding the intent of the Bee chapter. The City has produced no evidence indicating the Bee chapter intended to give the monument to the City. Indeed, in 1903, the Daughters of the Confederacy gave a fountain to the City for use in Alamo Plaza. The nature of the gift was clear. Ex. B, R. Schimpff Affid., p. 5. The minutes state, "On motion said gift was accepted with thanks." Ex. B, R. Schimpff Affid., Ex. 8 (second page). So, if the Daughters did not make a similar gift of the memorial, that absence of donative intent in 1899 suggests an intent to retain ownership.

If the Bee chapter wanted to give the memorial to the City as some sort of gift, then they would not need "use" of land. The City could have simply accepted the memorial "with thanks." Regarding the gift of the fountain in 1903, the Board of Aldermen did not give permission to the Daughters of the Confederacy to use land in Alamo Plaza for the "use" of the fountain. Instead, the Board approved a motion *accepting* the fountain "with thanks." That the Daughters sought permission to "use" the land in Travis Park indicates more than a simple gift. It indicates a continued, persistent "use" of the land for the memorial. Viewing the evidence in favor of the non-movant, there is no evidence to suggest the Daughters intended the memorial as a gift to the City of San Antonio.

### Conclusion

If the Daughters had intended the Confederate memorial to be a gift, they would have said so. When they gave a drinking fountain to the City, it was recorded as a gift in the Minutes. No such donative intent can be found in any record regarding the Travis Park

19

memorial. Construing the evidence in favor of the non-movant, there is no evidence to suggest the Daughters of the Confederacy intended the Travis Park memorial to be a gift.

WHEREFORE, Plaintiff prays that the Court grant Plaintiff's motion for partial summary decision, and for all relief, at law and in equity, to which it may be entitled.


Respectfully submitted,

20

Thomas J. Crane
T.S.B. No. 05007320

LAW OFFICE OF THOMAS J. CRANE
900 N.E. Loop 410, Suite D306
San Antonio, Texas 78209
(210) 736-1110
(210) 745-4258
tom@cranelawyer.net

Attorney for Plaintiff

Certificate of Service

I certify that a true copy of the foregoing instrument was electronically filed on the
_____ day of May, 2019 with the Clerk of Court using the CM/ECF system which
will send notice of such filing to the following counsel:

Shawn Fitzpatrick
Fitzpatrick & Kosanovich
P.O. Box 831121
San Antonio, Texas 78283-1121

Thomas J. Crane

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ALBERT SIDNEY JOHNSTON Chapter No. 2060, United Daughters of the Confederacy, ROBIN TERRAZAS, President, JEAN CAROL LANE, First Vice-President | § § § | |
| | | CIVIL ACTION NO. SA-17-CV-1072-DAE |
| v. | § | |
| THE CITY OF SAN ANTONIO | § | |

## ORDER

On this came to be heard the Plaintiff's Motion for Partial Summary Judgment. Having heard argument of counsel and reviewed the motion and attachments, including deposition excerpts and records, it appears that the motion has merit.  It appears that there is no genuine issue of material facts regarding ownership of the Travis Park memorial.

It is therefore:

ORDERED that the Plaintiff's motion be granted and that the Daughters of the Confederacy be recognized as owners of the former Travis Park memorial and that they have the right to "use" the land in the center of Travis Park for the Confederate memorial.

**SIGNED AND ENTERED** this ___ day of _____, 2018.


_____
DAVID A. EZRA
UNITED STATES DISTRICT JUDGE