EXHIBIT E
ROBIN TERRAZAS DEPOSITION

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

ALBERT SIDNEY JOHNSTON        )
CHAPTER NO. 2060, UNITED      )
DAUGHTERS OF THE              )
CONFEDERACY, ROBIN TERRAZAS,  )
PRESIDENT, JEAN CAROL LANE,   )   5:17-CV-1072-DAE
FIRST VICE-PRESIDENT,         )
                              )
          Plaintiffs,         )
                              )
vs.                           )
                              )
THE CITY OF SAN ANTONIO,      )
                              )
          Defendant.          )
_____)

***********************************

ORAL DEPOSITION OF

ROBIN TERRAZAS

AUGUST 29, 2018

***********************************

THE ORAL DEPOSITION of ROBIN TERRAZAS,

produced as a witness at the instance of the

Defendant, and duly sworn, was taken in the above

styled and numbered cause on Wednesday the 29th day

of August, 2018 from 1:23 p.m. to 4:03 p.m., before

PAMELA SUE PETERSON, Certified Shorthand Reporter in

and for the State of Texas, reported by stenographic

and computer-aided transcription, at the Law Office

of Thomas J. Crane, 110 Broadway, Suite 420,

San Antonio, Texas 78205, pursuant to the Federal

Page 18

1   have to ask you not to answer.
2       I mean, now you're getting into
3   attorney-client privilege.  You're asking her why her
4   attorney advised her to become a party to the
5   lawsuit.
6       Q.  BY MR. FITZPATRICK:  Let me just ask this.
7   Are you making any separate claims on your
8   individual -- in your individual capacity in this
9   lawsuit?
10      A.  I guess not, no.  I mean, I'm here as a
11  representative of the chapter.  I'm not trying to
12  separate myself.
13      Q.  Okay.  Well, actually, that saves a lot of
14  time here.
15          So, then, let me ask you some questions
16  about your -- your allegations here.
17          (Defendant's Exhibit T-1 was marked.)
18          MR. FITZPATRICK:  I have marked as
19  deposition Exhibit No. T-1, the copy of your third
20  amended complaint.
21      Q.  BY MR. FITZPATRICK:  On Page 3, it's your
22  allegation here that in March -- on March 27, 1899,
23  the City Council granted to the Bernard (sic) Bee
24  chapter the right to use the land in the center of
25  Travis Park; correct?

Page 19

1       A.  Uh-huh.
2       Q.  And I'm reading from Paragraph 5.
3           And would that be an interest that was --
4   that is reflected in what I'm marking as deposition
5   Exhibit No. 2?
6           (Defendant's Exhibit T-2 was marked.)
7           MR. FITZPATRICK:  I really screwed up.
8           Here you go, Tom.
9           THE WITNESS:  Okay.  So the handwritten
10  part you can't see at all, but -- so your question,
11  again, was does this document reflect the claim that
12  Barnard Bee chapter had the right to use the land?
13      Q.  BY MR. FITZPATRICK:  No, let me ask the
14  question again.
15          Is this the -- is Exhibit T-2 a
16  representation of what you have alleged to be an
17  ordinance dated March 27, 1899, whereby the City of
18  San Antonio granted to the Bernard Bee chapter the
19  right to use the land in the center of Travis Park?
20      A.  Yes.
21      Q.  Okay.  Is there any other document on which
22  that claim is based?
23      A.  No.
24      Q.  Okay.  So you also allege that the City
25  gave in the same -- I'm sorry -- I'm in the same

Page 20

1   paragraph here -- that the City gave use of the land
2   underneath the monument to the Bernard E. Bee chapter
3   in perpetuity.  Are you making that allegation?
4       A.  Yes.
5       Q.  And by "in perpetuity," what do you mean by
6   that?
7       A.  That it was a permanent -- it was given use
8   permanently.
9       Q.  Okay.  And what is your understanding of
10  whether or not the monument was intended to remain
11  there permanently?
12      A.  I know it was -- it was stated in 1999 when
13  they rededicated the monument -- the Albert Sidney
14  Johnson (sic) chapter rededicated the monument in
15  1999.  And the president at that time was Theresa
16  Gold, and she -- she reported it having been in
17  perpetu-- whatever -- she used that word, too; that
18  it had been granted to -- the chapter had been
19  granted use of that land.
20      Q.  Okay.  I mean, is it your understanding
21  that the chapter intended the monument to remain
22  there forever?
23      A.  Yes.  Yes.
24      Q.  Okay.  So if you look at Exhibit T-2, is
25  there -- can you find me any indication in there of

Page 21

1   the type of permanence that you've just testified to?
2       A.  I don't see anything that says until any
3   certain condition exists that it would be removed.
4   It's a large statue.  I can't imagine that the City
5   would have said, "Okay, here, you can put this statue
6   here and we expect it to be removed at some point,"
7   considering the size of it.
8       Q.  Okay.  The language in Exhibit T-2 does not
9   use the term "perpetual," does it?
10      A.  No, it does not.
11      Q.  Okay.  It doesn't say "forever"?
12      A.  It doesn't say any limitations.
13      Q.  Okay.  Well, and what exactly were the
14  Daughters of the Confederacy asking for, according to
15  Exhibit T-2?
16      A.  Permission to erect a monument in Travis
17  Park.
18      Q.  Anything else?
19      A.  I don't see anything else, no.
20      Q.  Okay.  Where is Bernard E. Bee mentioned
21  here?
22      A.  It is not mentioned here, but the petition
23  was written by Barnard E. Bee.
24      Q.  Do you have a copy of the petition?
25      A.  I don't remember.

6 (Pages 18 to 21)

Robin Terrazas                              Albert Sidney Johnston v. City of San Antonio

Page 34

1    A.  Right.
2    Q.  All right.  Moving back one page to
3  Page 52, we have an August 28th e-mail?
4    A.  Uh-huh.
5    Q.  And that obviously was preremoval; correct?
6    A.  Uh-huh.
7    Q.  All right.  And RT51 is dated August 7th,
8  that is also preremoval?
9    A.  Uh-huh.
10   Q.  That's an e-mail from you to various --
11   A.  Council members, uh-huh.
12   Q.  Yeah.
13       And RT50 appears to be the same thing as
14  RT53.
15   A.  Yeah, it does.
16   Q.  To me.  Does it appear so to you?
17   A.  Uh-huh, just the print looks smaller.
18   Q.  Yeah.
19       And then the first page of the packet,
20  RT49, to me -- well, it's different than -- yeah,
21  that's a separate e-mail; correct?
22   A.  From September 5th to September 1st?
23   Q.  Yeah.  RT49 is not duplicated anywhere else
24  in Exhibit T-3, is it?
25   A.  I don't think so.

Page 35

1    Q.  All right.  So do you recall having sent
2  any other e-mails to the City, besides the ones that
3  I have here, except for the ones that were exchanged
4  with the -- with the Clerk's office?
5    A.  Not that I recall.
6    Q.  Okay.  So I want to take you to the first
7  one that you sent.  It was August 7th, and it's RT51.
8    A.  I'm sorry, RT --
9    Q.  RT51.
10   A.  Okay.
11   Q.  So there's handwriting at the top
12  that says, "To all Council members"?
13   A.  Uh-huh.
14   Q.  Whose handwriting is that?
15   A.  That looks like mine.
16   Q.  Okay.  And then there's a "Yoakum National
17  Bank"?
18   A.  I have no idea what that is there for.
19   Q.  Okay.  Did you put that there?
20   A.  No.
21   Q.  It just ended up there?
22   A.  I don't even know what that is.
23   Q.  Okay.  What was the purpose -- what was
24  your purpose in sending this e-mail?
25   A.  You know, I think I felt like the Council

Page 36

1  members maybe didn't understand the true meaning of
2  the monument, and that they needed to know that.  No
3  one had ever asked us, and so I -- I sent this,
4  hoping that receiving the correct information from
5  the organization that placed the monument there would
6  be helpful in making a fair decision about what it
7  was they were trying to do.
8    Q.  This was educational?
9    A.  Yes.
10   Q.  Okay.  You don't indicate anywhere in this
11  e-mail that you believed that your organization owned
12  the monument, do you?
13   A.  Not in that.  No.
14   Q.  Or that your organization owned the time
15  capsule; correct?
16   A.  We -- I never mentioned the time capsule
17  because I was concerned about its safety; so that, I
18  didn't mention until they started taking it down.
19  And I tried calling to inform them that the time
20  capsule existed before something would happen to it.
21   Q.  So prior to removal there was never any
22  assertion of ownership of the time capsule --
23   A.  No mention of the time capsule at all.
24   Q.  Okay.  And in this Exhibit T-3, Page RT51,
25  you don't indicate that your chapter owns any

Page 37

1  property in Travis Park either?
2    A.  Not in these e-mails.  I had communication
3  with Jackie Salvador; and my understanding was that
4  this information was going to -- was going to the
5  City.  So I kind of saw it separate communication,
6  that these e-mails were to try to educate on the
7  meaning of the monument.  And that the legal aspect
8  of it was already being addressed through the
9  information that I was sending to the Archives
10  Department.
11   Q.  Okay.  So there is nothing in the e-mail
12  that you sent to the Council members indicating that
13  your chapter was asserting an ownership interest in
14  the park?
15   A.  No, I -- no.
16   Q.  Okay.  And is it your belief that your
17  e-mail -- the e-mails that you exchanged with
18  Miss Salvador indicated an assertion by you that your
19  chapter owned some type of a possessory interest --
20   A.  Yes.
21   Q.  -- in Travis Park?
22   A.  Yes.
23   Q.  And is it -- is it your testimony that the
24  e-mails that you exchanged with Miss Salvador also
25  expressed your contention that the chapter had an

10  (Pages 34 to 37)

Robin Terrazas                                    Albert Sidney Johnston v. City of San Antonio

---

**Page 38**

1  ownership interest in the monument itself?
2      A.  I'd have to look back at that. I don't
3  remember the ...
4      Q.  Okay.
5      A.  But I definitely made it clear that we had
6  an interest in it. I don't remember if there was --
7  ownership was ...
8      Q.  Okay. The next page of T-3 is RT52. And
9  that was another preremoval e-mail from you to the
10  City's decision-makers; is that correct?
11     A.  Yes.
12     Q.  Okay. Was the purpose of this e-mail
13 different than the purpose of your August 7th e-mail?
14     A.  I would say it was different, yes.
15     Q.  Okay. So what was the purpose of this one
16 that was different than the purpose of the August 7th
17 e-mail?
18     A.  I just got -- I felt by this time that it
19 didn't seem to matter to them what the truth of the
20 monument was; and that what they were basing their
21 decision on had more to do with their own
22 interpretation of what they thought about the
23 monument and the people who put it there. And I felt
24 that they were basing it on racism, which did not
25 exist.

---

**Page 39**

1      Q.  Okay. Do you think that there can be more
2  than one interpretation of what the monument means?
3      A.  Depending on what you know about the
4  monument.
5      Q.  Even with perfect knowledge, do you think
6  there can be differing interpretations?
7      A.  For as many individuals as there are in
8  this world, that's how many opinions and views there
9  will be in this world.
10     Q.  Okay. So apparently by the time that you
11 wrote this e-mail it appeared to you -- and I'm going
12 off of the first sentence of the text of the
13 e-mail -- that you believed that the City had decided
14 to move the statue from Travis Park anyway; is that
15 more or less true?
16     A.  That's the way it was looking.
17     Q.  Okay. And you advised -- if you look about
18 two-thirds of the way down the text, there's a
19 sentence that begins on the right with "You are
20 joining into a very dangerous practice"?
21     A.  Uh-huh.
22     Q.  So what is it that -- what is it that you
23 think the City was missing there?
24     A.  I think they were trying to blame what
25 happened in Charlottesville, or use that incident as

---

**Page 40**

1  a reason to move this one.
2      And if that was the case, then what they
3  were saying was that we will give into violence. If
4  people want to be violent in order to get what they
5  want, that they would be willing to give into that.
6      And that's dangerous, because if you are
7  going to allow violence to rule rather than stand up
8  and say, "Let's bring the two sides together. Let's
9  have an understanding. Let's not jump into something
10 here," then really you're empowering those people who
11 are being violent.
12     Q.  You go on to say that -- that "The war was
13 really one of independence"?
14     A.  Yes.
15     Q.  And what do you mean by that?
16     A.  I mean that the war -- the war
17 started -- the war -- the war between the States or
18 the Civil War was not started over slavery.
19 President Lincoln and Jefferson Davis both stated
20 that the war was not about slavery. Lincoln wanted
21 to hold the Union together, and Davis wanted the
22 States' rights. There were issues that they were
23 fighting over. Did slavery exist? Yes. Did it
24 become a part of the war? Yes. But that's not why
25 the war was started.

---

**Page 41**

1      Q.  Okay. So four lines, five lines up from
2  the bottom, you indicate that "The monument
3  represents a time that none of us wants to live"?
4      A.  Uh-huh.
5      Q.  I'm not sure what you meant by that. Could
6  you explain that?
7      A.  Well, none of us wants to get into a civil
8  war. None of us wants to have to fight brother
9  against brother or father against son. And, of
10 course, none of us wants to see slavery. That's not
11 an acceptable thing.
12     Q.  Okay. I -- that makes perfect sense. I
13 just don't think that I read that clearly when I read
14 it.
15     But you go on to say that "The monument
16 honors those who died for what they believed in"?
17     A.  Yes.
18     Q.  "And it was not slavery that they were
19 fighting for"?
20     A.  Right.
21     Q.  Okay. So it would matter, then, what the
22 reason was for -- you know, for the war itself, in
23 that respect?
24     A.  I'm sorry. What --
25     Q.  Okay. You were explaining earlier what you

---

11 (Pages 38 to 41)

Exhibit T3

EXHIBIT F
ROBERT SCHLITZBERGER REPORT

Daughters of the Confederacy

Travis Park Monument

San Antonio, Texas

To formulate a reasonable estimate as to the current value of the monument, the following prices are taken into equation:

| | |
|---|---|
| Pedestal | $95,984 |
| Statue of Soldier | $82,228 |
| Freight & Crating | $10,000 |
| Foundation & Soil Test | $20,000 |
| Assembling Monument | $42,000 |
| Material Expenses in total | $250,212 |
| Tax if applicable | $20,642 |
| Subtotal | $270,854 |
| Administrative Fee | $67,713 |
| Total Installed | $338,567 |

I have reviewed all the information available and certify that this is a fair market price.

*Robert C. Schlitzberger*

Robert C. Schlitzberger   CM, AICA

7/12/18

EXHIBIT
2
RS

ASJ00474

*RCB*

## Confederate Statue at Travis Park in San Antonio

The 1890's cenotaph was sculptured from fine grained dark gray granite probably from the now defunct Burnet, Texas Quarry.  Creation of the piece was by Frank Teich (reference: Wikipedia), one of the most sought after artisan of his time and is still revered by modern sculptors.  Overall height of 38 feet and consisting of 21 pieces of stone and with an estimated weight of 42 tons (84,000 lbs), the piece was created at Mr. Teich's studio and moved to the Travis Park site where skilled workmen would have adjusted and fitted the stones together in place.  Most of the granite sculpturing was chisel work by hand.  Only the two vertical polished shafts would have been finished to size using a gang saw.  The stone with the wreath and the stone with the garland and stars are both fine examples of the skilled craftsman's abilities but the statue is the definitive portion of the piece and truly highlights the expertise of Mr. Teich.  Sadly it appears to have been damaged recently as parts of the rifle have been epoxied together and that epoxy appears to be very new.  The end of the rifle barrel was not with the rest of the stones and could be lost.

This is as comprehensive of a report that could be made considering that some pieces were crated, the temperature of the warehouse in which it was stored and the limited amount of time that we were allotted for inspection.

ASJ 00475

*RCS*

## Time Capsule, Etc.

Typical of public memorials of that era, there is a time capsule in the base. One of the corner pieces appears to have had a chiseled recess in which a metal and glass box had been placed and covered in concrete. Upon our inspection the concrete covering the top of the box had been removed and the interior of the box exposed. In my opinion the concrete covering the box was broken during the dismantling of the monument. I'm not sure that the crew doing the dismantling would have recognized the time capsule for what it was, not taking any precautions to document and safeguard any contents. The possible lack of knowledge as to the handling of memorials of this nature was evident in other areas. Obviously the broken rifle and its repair testify to that, but the use of a grinder on the joint line of the vertical shaft was evident. Also, there were holes drilled and pins hammered or screwed into most of the granite above the first sub base. A lifting device was then attached to these pins allowing the stone to be moved. This was totally unnecessary and actually could have compromised the integrity of the stones. These same stones had, had chiseled out holes in their tops in which a Lewis pin was inserted for the purpose of safely handling of the granite. It appears the dismantling crew used new holes and new pins to lift the stone, when they could have simply used the old holes and a Lewis pin. The concern would be that if the new

ASJ 00476

*RCS*

pins were used again, there could be some cracking of the stone. Again, I don't believe the dismantling crew would have been knowledgeable enough to recognize the chiseled out holes for what they where.

*Robert C Schlitberger*
7/9/18

A S J 00477

# EXHIBIT G
# EVA LONG AFFIDAVIT

<u>AFFIDAVIT</u>

"My name is Eva Breed Long; I am over the age of eighteen, and am capable of providing this statement and affidavit.

"I am providing this statement and affidavit of my own personal knowledge, freely and willingly, as part of a lawsuit filed by the Albert Sidney Johnston chapter, No. 2060 against the City of San Antonio.

"I was President of the Texas Division from 2016 to 2018. I have been a member of the UDC since 1981 and have held various positions at the chapter and state level. As President, it was part of my responsibility to become familiar with UDC by-laws and requirements at the state and national level. The Texas Division is the parent organization for the Albert Sidney Johnston 2060 chapter. We were also the parent organization for the Barnard E. Bee 86 chapter prior to its dissolution in 1972.

"The Bee chapter disbanded in 1972. At the time, it transferred its assets and any property interest to the Albert Sidney Johnston 2060 chapter. On January 20, 1972, the president of the Barnard E. Bee 86 chapter presented the president of the Albert Sidney Johnston 2060 chapter with a certified copy of the City of San Antonio Ordinance, which we at state level considered to be a transfer of that property.

"That property transferred included, but was not limited to the monument, its base and the contents in either the base of the monument, and the Time Capsule. As far as the Texas Division was concerned, the Bee chapter transfer of assets complied with state and national requirements. The Bee 86 chapter did everything it needed to do to transfer its assets to the ASJ 2060 chapter.

"The Texas Division is a registered 501(c)(3) organization which is able to accept donations. The Texas Division is registered with the state of Texas. The individual chapters are also 501(c)(3) organizations under the Texas Division umbrella.

DocuSign Envelope ID: DBFDC6DB-7959-403C-B062-C45E9EA72CF4

"I declare under penalty of perjury that the above statement is true and correct. I have been given an opportunity to review this statement and to make any necessary changes."

Signed on _____5/13/2019_____, 2019.

DocuSigned by:

*Eva Long*

Eva Breed Long
Ex Division President
Texas Division, United Daughters of the Confederacy

2